GUY C. MYERS, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket Nos. 914, 3216.   Promulgated September 28, 1948.

*George R. Sheriff, Esq.*, and *George V. Mahoney, Esq.*, for the petitioner.

*Wilford H. Payne, Esq., Douglas Barnes, Esq., John T. Rogers, Esq.*, and *Kennedy C. Watkins, Esq.*, for the respondent.

HARLAN, *Judge*: The Commissioner determined deficiencies in Federal income tax for the years 1940 and 1941 in the respective amounts of $123,209.49 and $223,662.30.   Three questions are presented:

(1) Whether the income received by the petitioner during the taxable years 1940 and 1941 under contracts with various public utility districts is subject to taxation under the limitations provided by section 107 of the Internal Revenue Code.

(2) Whether the contract income received by the petitioner from the public utility districts for the years 1940 and 1941 constituted community income of petitioner and his wife under the laws of the State of Washington, taxable one-half to each spouse, or whether it constitutes the separate income of the petitioner.

(3) Whether petitioner is entitled to deduct from his income for the year 1940 as an expense or otherwise the sum of approximately

$32,000 repaid by him in that year to an individual who had advanced that sum to the petitioner in the years 1938 and 1939.

### FINDINGS OF FACT.

Petitioner Guy C. Myers filed his income tax returns for the years 1940 and 1941 with the collector of internal revenue for the district of Washington. In those returns he gave his address as Seneca and Fourth Streets, Seattle, Washington. He was fifty years of age in 1940.

Myers had attended the Universities of Pennsylvania and Wisconsin for a total of three years. Thereafter, and while a resident of Montana, he began buying and selling utility bonds and in 1932 he acquired desk space in an office in New York City. In 1936 he occupied an office suite in Wall Street, and he continued to maintain that office up to the time of the hearing.

In 1932 J. D. Ross, who was then head of the City Light Department of Seattle, hereinafter referred to as City Light, and other individuals connected with this publicly owned utility, went to New York to engage the services of petitioner in order to procure a substantial loan for the development of the power facilities of City Light. Serious difficulties had been encountered in financing this project, due to the fact that a privately owned utility, the Puget Sound Power & Light Co., hereinafter referred to as Puget Sound, competed with the municipally owned City Light within the city of Seattle. Nevertheless, Myers procured the required loan from a banking firm. During these negotiations Ross and Myers conceived the plan of the purchase of the facilities of Pudget Sound by City Light, and Myers began some exploratory investigations which involved, in 1932, a visit to Seattle.

In August 1934, at the suggestion of Ross, petitioner went to Seattle to conduct operations on the purchase of the Puget Sound utility, intending to devote as much time as necessary to develop this project. At the time of the hearing Myers was still working on this purchase and sale on behalf of City Light on a contingent fee basis, but no purchase had at that time been made.

The plan of operation was that the city of Seattle would sponsor the purchase of the entire Puget Sound system, inasmuch as that company refused to sell anything less than its entire plant and equipment, and after the purchase it was planned to liquidate all of the facilities not needed for the service of Seattle and the surrounding territory to public utility districts thereafter to be created out of the remaining portion of the territory served by Puget Sound. It was

planned by Myers, Ross, and others connected with City Light that petitioner would be paid for his services by the public utility districts, hereinafter referred to as PUDS, or by the city of Seattle as the property of Puget Sound was proportionately acquired by the respective units.

Petitioner made repeated trips through the counties served by Puget Sound endeavoring to educate the people in the desirability of public ownership and advising groups as to the steps to be taken to create PUDS. In this work petitioner also conferred with groups of other counties either wholly served by utility companies other than Puget Sound or only slightly served by Puget Sound. In these counties plans were developed to purchase the light companies serving the various counties either by contract or by condemnation and also to construct publicly owned power plants where purchase was not practicable.

By 1937 the actual creation of PUDS began and thereafter petitioner procured from these county units written contracts setting forth the terms and conditions by which Myers would work on the purchase or condemnation of various privately owned power facilities or in the financing and erecting of new power plants on a commission basis. These contracts were alike in essential characteristics. They referred to Myers as "the banker" or as "fiscal agent." He was required to advise and assist in the creation of the district, to cash expense warrants for the district up to a specified percentage, to market and sell the bonds, to employ and pay a designated legal firm, and also to employ a fiscal agent. In the event the condemnation, purchase, or erection of contemplated power facilities was not carried out by the district after the banker had performed his work, it was provided in the contract:

The district shall pay to the banker the expenses which he shall have incurred in performing the services stated in behalf of the district, including reasonable fees for reasonable services.

Otherwise, his percentage compensation was declared to be in full payment for all of his services and expenses. No compensation was ever expected by Myers or received by him from the sellers of the power facilities. The Pacific County PUD and Cowlitz County PUD were created in 1937. The Grays Harbor PUD was created in 1938.

On October 15, 1941, petitioner reported to the Tax Commission of Washington that a $40,000 gift which he was making to his daughter came "from assets acquired by me from earnings made during the years 1939, 1940, and 1941, * * * from my activities in aiding the financing of various public power districts in the purchase of facilities from private power companies in the State of Washington and elsewhere."

When Myers went to Seattle in 1934 a PUD was already in existence in Mason County, Washington. This territory was served by a small privately owned plant and shortly after Myers went to Seattle in August of 1934 the manager and the commissioners of the Mason County PUD went to Seattle to consult Myers and to solicit his help in the purchase of the power facilities already operating in that county. Thereupon Myers made inquiry of the owners of the stock in the existing facility as to the possibility and terms of a sale to the PUD, and Myers, together with J. D. Ross and R. W. Beck, worked on this project, along with other projects being developed at that time. On October 11, 1940, Myers and the Mason County PUD signed a written contract setting forth specifically the terms and conditions under which Myers was to be paid substantially in the terms provided for in other PUD contracts. Shortly thereafter and during 1941 the sale of the Mason County PUD was completed and Myers was paid his commission.

Myers, in cooperation with Ross and others associated with Ross, worked on the sales in the Grays Harbor, Cowlitz County, and Pacific County districts from 1934 until the time of their completion. After the organization of the various units much work was required in the sale of the bonds, contesting litigation, and other forms of negotiation. In completing the Grays Harbor deal it was necessary for Myers to purchase personally from his own funds a waterworks plant at a cost of $16,003.60, the fair market value of which was $12,000, occasioning him a loss of $4,003.60, which he deducted from his compensation of $71,050 paid him by the Grays Harbor PUD.

In or about 1933 three public power districts were created in Nebraska, known as the Loup River Public Power District, Platte Valley Public Power & Irrigation District, and the Central Nebraska or Tri-County Public Power & Irrigation District. They were popularly known as hydros. They were created to build plants for the generation of power and for irrigation purposes. The Federal Public Works Administration lent them $40,000,000. However, they had no means of distributing the power which they created except through the private power companies, and these companies, instead of the ultimate consumer, received the benefits of cheap power generation.

Ross headed a committee designated by the Secretary of Interior to make recommendations with respect to the purchase of the distributing facilities in the State of Nebraska, to furnish the hydros an outlet and enable them to be self-supporting. The committee recommended the purchase by the hydros of the distributing companies. Ross recommended to the hydros the employment of Myers to negotiate these purchases and the proposition was agreed to. Thereafter Myers had numerous talks with the managers of the hydros and began

negotiations with the power companies with a view to their purchase by the hydros. Shortly after July 4, 1934, when Myers conferred with the hydros' representatives, an oral agreement as to compensation was arranged whereby Myers was to receive 2½ per cent of the first $4,-000,000, 1½ per cent of the next $10,000,000, and 1 per cent of the balance of the purchase price. His commission was to be contingent on the consummation of each purchase and each purchase was separate and not contingent upon any other purchase. Myers negotiated these prospective purchases until 1937, when formal contracts were drawn up covering the nature of his services and the compensation therefor. In these contracts the compensation was provided to be 2½ per cent of all bonds sold.

By 1938 formal contracts for the purchase of privately owned facilities had been prepared and as to two of the companies the contracts had been signed by the vendors and purchasers. In one case involving the Iowa-Nebraska Light & Power Co. the sale had been approved by the Federal Power Commission, the bonds had been printed, and banking arrangements had been made. However, financing difficulties stopped further proceedings.

The difficulty in financing was due to the fact that the loan agreement with P.W.A. provided that P.W.A. should have a first lien on all assets of the hydros thereafter acquired, which agreement in effect would subject all of the distributing facilities purchased by the hydros to a first lien of the P.W.A. indebtedness. Under such circumstances, it became impossible to sell second mortgage bonds to make the contemplated purchases. Myers and a number of others connected with the hydros made extensive efforts in Washington to persuade P.W.A. to waive its first lien on the new distributing facilities, but P.W.A., after much negotiation, refused to subordinate the priority of their lien protecting the $40,000,000 loan and without such subordination the sale of the bonds became impractical and the purchase of the power companies by the hydros was abandoned on or about January 1, 1939.

It was then determined by the directors of the three hydros at a joint meeting at which Myers, his attorney, and other interested parties were present, to organize an independent district to purchase the power distributing outlets. It was planned first to purchase the supplying utility for Columbus, and, after that had been effected, to expand into other districts as opportunity afforded. The plan was for the new organization, after acquiring the facilities for distribution from the privately owned companies, to lease these facilities to the hydros so that the original plan of the hydros to manufacture and distribute under one control could be carried out. Inasmuch as Columbus was in the territory of the Loup River Public Power Dis-

trict, the directors of that district were selected to become the directors of the new Consumers organization, and they agreed so to do. They filed their petition with the proper state official and shortly thereafter were recognized as a corporate body, known as Consumers Public Power District, with subsequent directors to be elected by the people at regular elections. The president of Consumers was the president of Loup and the board of directors of the two organizations were the same individuals. Consumers was organized in July 1939 and thereafter on October 30, 1939, petitioner entered into a written contract with Consumers whereby he was employed as its "agent" to assist in the acquisition of power facilities in the state, to help arrange to finance such purchases, and to otherwise advise it in such matters. Myers' compensation was to be as follows: 2½ per cent of the first $4,000,000, plus 1½ per cent in excess of $4,000,000 but less than $14,000,000, plus 1 per cent in excess of $14,000,000 of the cost involved. However, should a power plant be erected by the district, it was provided that Myers should receive as compensation 1¼ per cent up to $4,000,000, plus ¾ of 1 per cent in excess of $4,000,000 up to $14,000,000, plus ½ of 1 per cent in excess of $14,000,000. Consumers then proceeded to acquire the power facilities of various privately owned companies in the state.

Myers reported compensation in his income tax return for 1940 as follows:

State of Washington:

| | | |
|---|---:|---:|
| Grays Harbor | | $67,046.40 |
| Pacific County | $5,699.65 | |
| | 11,114.14 | |
| | | 16,813.79 |
| Cowlitz County | | 33,000.00 |
| Gross compensation | | 116,860.19 |
| Less expenses in connection therewith | | 45,126.61 |
| Net compensation | | 71,733.58 |

State of Nebraska (Consumers):

| | |
|---|---:|
| Columbus Division | 30,687.93 |
| Southern Division | 26,250.00 |
| North Platte Division | 38,750.00 |
| Elkhorn Division | 16,115.62 |
| Northeastern Division | 74,400.00 |
| Gross compensation | 186,203.55 |
| Less expenses in connection therewith | 71,904.19 |
| Net compensation | 114,299.36 |

Skamania, Washington:

Skamania, Washington_____ $1,307.63

Less expenses in connection therewith_____ 504.95

Net compensation—Skamania_____ 802.68

In his income tax return for 1941 he reported compensation as follows:

State of Washington:

Mason County_____ $8,750.00

State of Nebraska:

Central, Nebraska_____ 139,353.12

Iowa, Nebraska_____ 321,268.29

McCook, Nebraska_____ 12,468.75

Gothenberg, Nebraska_____ 9,500.00

482,590.16

Missouri Valley, Nebraska_____ 690.00

Gross income from services_____ 492,030.16

Less business expenses_____ $113,534.56

Allocation:

Washington _____ $\dfrac{\$8,750.00}{\$492,030.16}$    $2,019.03

Nebraska (1934–40) _____ $\dfrac{\$482,590.16}{\$492,030.16}$    111,356.31

Nebraska (1941) _____ $\dfrac{\$690.00}{\$492,030.16}$    159.22

113,534.56

Net compensation_____ 378,495.60

In his income tax return for 1942 he reported compensation as follows:

Income:

Compensation received for personal services rendered:

Consumers Public Power District—

Western Public Service Division, Nebraska_____ $116,226.85

Consumers Public Power District—

Missouri Valley Division, Nebraska_____ 1,380.00

117,606.85

Expenses_____ 72,902.23

Net income_____ 44,704.62

In his income tax return for 1943 he disclosed the following:

Income relative to sales in Nebraska—

Consumers' Public Power District, Western Public Service Division, Nebraska_____ $17,586.47

Allocated expenses not disclosed.

The 1944 return disclosed the following income from the Nebraska transactions:

| | |
|---|---:|
| Consumers' Public Power District | $93,575.66 |
| Prorated expense | 27,439.81 |
| Net income | 66,135.85 |

Before any purchase was consummated by Consumers a geographical division was created covering the territory to be served by the power unit to be purchased. Each division thus created had a board of directors consisting of the board of directors of Consumers and each division issued its own bonds to provide funds for the purchase of the property which served its particular territory. Myers was paid out of the funds raised by each division for the purchases made by that division at the graduated rates of 2½ per cent, 1½ per cent and 1 per cent, as hereinbefore set forth.

After the various divisions acquired the power generating and distributing facilities, many of the generating facilities were leased to the hydros and the division of Consumers acted as distributing outlets for the power generated by hydros.

The various purchases involved herein were completed as follows:

| | |
|---|---|
| Grays Harbor | Jan. 16, 1940 |
| Pacific County | Mar. 5, 1940 |
| Cowlitz County | Dec. 11, 1940 |
| Columbus Division | July 5, 1940 |
| Southern Division | Oct. 19, 1940 |
| North Platte Division | Nov. 1, 1940 |
| Elkhorn Division | Nov. 20, 1940 |
| Northwestern Division | Dec. 30, 1940 |
| Mason County | Mar. 4, 1941 |
| Central Division | Jan. 7, 1941 |
| Eastern Division | Apr. 4, 1941 |
| McCook Division | Apr. 29, 1941 |
| Gothenberg Division | June 13, 1941 |

OPINION.

In considering the applicability of the provisions of section 107 of the Internal Revenue Code as in force in 1940,[1] and also in force in

---

[1] SEC. 107. * * *

In the case of compensation (a) received, for personal services rendered by an individual in his individual capacity, or as a member of a partnership and covering a period of five calendar years or more from the beginning to the completion of such services, (b) paid (or not less than 95 per centum of which is paid) only on completion of such services, and (c) required to be included in gross income of such individual for any taxable year beginning after December 31, 1938, the tax attributable to such compensation shall not be greater than the aggregate of the taxes attributable to such compensation had it been received in equal portions in each of the years included in such period.

1941,[2] to the income of petitioner, we have divided the utility districts from which petitioner's income arose into three groups: (1) Mason County PUD; (2) Grays Harbor, Pacific County, and Cowlitz PUDS; and, (3) the various divisions of Consumers public power districts in Nebraska.

The compensation from Mason County PUD was received in 1941 and exceeded 75 per cent of the entire compensation received by petitioner for his services in the acquirement of the power facilities for that district in 1941.

In or shortly after August 1934 the officials of this PUD requested petitioner to assist them in the procurement of power facilities in their county. The PUD at that time was an existing corporate body, empowered to acquire and operate electric power developments. Petitioner agreed to, and did, assist the Mason County group, on a contingent commission basis, but the specific terms of his initial agreement are not in the record. He continued his promotional activities until in October 1940, when his employment agreement was reduced to writing and signed by the parties thereto. The sale was completed a few months later.

The Commissioner contends that Myers' period of employment began with his written agreement and, therefore, lasted but a few months, and that his compensation was not for personal services, since a part of his services consisted of acting as a banker in cashing expense vouchers, employing a lawyer, and performing other acts not necessarily connected with his function as a broker.

We do not agree with either of these contentions. When Myers was solicited in 1934 by the constituted authorities of Mason County PUD to help that corporation purchase private power facilities and he began exploratory work to determine the factors in the problem involved, he began rendering personal service to the Mason County PUD, even though the exact terms of his employment and compensation may not have been agreed upon at that time. It is a matter of common knowledge that a large proportion of professional employment does not occur under accurate contracts stipulating in advance the terms of payment.

We can not agree with the Commissioner that the services rendered by Myers not necessarily associated with his activities as a broker were

---

[2] The above section was amended by the Revenue Act of 1942 and as the amendment applied to the taxable year 1941 the section read as follows:

"(a) PERSONAL SERVICES.—If at least 75 per centum of the total compensation for personal services covering a period of sixty calendar months or more (from the beginning to the completion of such services) is received or accrued in one taxable year by an individual or a partnership, the tax attributable to any part thereof which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual."

not personal services. While Myers was referred to as a banker and while he did agree to cash expense vouchers for the districts when necessary and also procure a market for the bonds, these activities were merely incidental to his principal employment and were personal services to the extent that under the circumstances they were a necessary part of the activities which he contracted to do and which were unquestionably personal in character.

We conclude therefore that the taxpayer is entitled to be taxed on his income from the Mason County PUD under the amendment to section 107 as contained in the Revenue Act of 1942.

With respect to the income received from the remaining three Washington PUDS, we are confronted with a basically different situation in that these PUDS did not exist until 1937 and 1938 and were not in existence for five years prior to petitioner's receipt of his compensation in 1940.

Petitioner, however, contends that this is immaterial, since he began to work on these projects shortly after his arrival in Washington in 1934 and an agreement which he had made with Ross when he began to work was approved by the PUDS when they were incorporated. He further says that the PUDS received the benefit of petitioner's promotional activities, without which they would never have been created.

The difficulty with this contention is that it overlooks the repeated use of the word "services" and the use of the word "rendered" in section 107 of the code. This contention also treats the word "work" as being synonymous with "services." Said section confines its application to: "Compensation received for personal *services rendered* by an individual * * * covering a period of five calendar years or more from the beginning to the completion of *such services.*"

Webster's New International Dictionary defines "service" as being an "act of serving; the occupation of a servant; the performance of labor for the benefit of another, or at another's command." "Work" is defined as "exertion of strength or faculties for the accomplishment of something, physical or intellectual effort directed to an end." "Render" is defined as "to furnish, contribute, to give, deliver."

Thus it is obvious that the statute, when speaking of rendering services, requires the existence of a person, unincorporated group, or corporation to whom such services may be rendered. The record is rather vague as to just when petitioner began work on the purchases for these districts. Petitioner believes it was in 1934 and, for the argument, we shall accept this date. He thus worked approximately three years before Pacific County and Cowlitz County PUDS were in existence and approximately four years before Grays Harbor PUD was created. During all of this time there was no one who could

speak authoritatively for these districts or incur expense in their behalf. There was no promoter in the sense that a private corporation might have a promoter who could control the creation of the corporation and determine who the initial stockholders should be. Neither Ross nor any of his associates occupied the position of promoter for any of these PUDS, nor did they have any official connection with them. The voters of the respective districts had all matters under their control, and if they had declined to approve incorporation there would have been no entity in existence to reap the benefit of Myers' promotional efforts. Prior to incorporation there was no one to whom Myers could render services and the earliest possible beginning of the period during which "such services" could be rendered was the date of the incorporation of the district involved. The end of that period was the date when the purchase was completed, which in all cases covered less than sixty months.

Artists, writers, composers and inventors frequently work for long periods on the development of artistic productions or useful ideas without being able to say they are "rendering services" because there is no particular person for whom they are working. The mere fact that Congress, in enacting the 1942 amendment to section 107, felt called upon to add a special paragraph to said section in order to include the work which had been done under specified conditions to be considered as services rendered, would clearly indicate that those groups not covered by the amendment could not get the benefit of the act. We quote the material portion of said provision in the margin.[3] If Congress had intended to permit promoters to include the work which they performed in acquiring customers in their period of service after the customers are acquired, it would have been very easy to include promoters with artists, writers, composers, and patentees.

This Court has been very careful not to extend the terms of section 107 (b) beyond their clear meaning. In *Jean DeMarco*, 9 T. C. 1188, a sculptor who responded to a solicitation for competitive designs for work on the War Department Building submitted designs in July 1940 and they were accepted and some work was performed until September 1942, when, under the terms of the contract, it was stopped. In order to bring himself within the thirty-six months requirement of the statute the taxpayer therein contended that the winning design

---

[3] (b) * * * If, in the taxable year, the gross income of any individual from a particular artistic work or invention by him is not less than 80 per centum of the gross income in respect of such artistic work or invention in the taxable year plus the gross income therefrom in previous taxable years and the twelve months immediately succeeding the close of the taxable year, the tax attributable to the part of such gross income of the taxable year which is not taxable as a gain from the sale or exchange of a capital asset held for more than 6 months shall not be greater than the aggregate of the taxes attributable to such part had it been received ratably over that part of the period succeeding the close of the taxable year but not more than thirty-six calendar months.

had resulted from sketches and models which he had made as far back as 1937. This Court, however, held that when the statute prescribed that the work should be "an artistic composition," it referred to the whole design as a unit and not to work on the preliminary sketches or component ideas.

Also, in *Lindstrom* v. *Commissioner*, 149 Fed. (2d) 344, the court held that the time of services performed by a lawyer, who later joined a partnership, could not be added to the period of service of his partner so as to give the partner the tax benefit of section 107 of the code. Concerning the interpretation of that section the court said: "A taxpayer claiming its benefits must bring himself within the law of the Congressional grant."

The petitioner, however, cites *Slough* v. *Commissioner*, 147 Fed. (2d) 836, where the court held that the use of the word "year" in defining the period of the receipt of income meant "calendar year" and not "taxable year" and that the statute must be construed liberally to accomplish the result intended by Congress.

Petitioner relies also on *John Bell Keeble, Jr.*, 2 T. C. 1249, where the term "five calendar years" was construed to mean sixty months in order to carry out the intent of the statute. However, under even the most liberal rule of construction we are persuaded that services can not be rendered to a nonexistent person and we can not consider "work" and "services" as synonymous terms. The petitioner himself, in a letter to the Washington State Tax Commission, admitted that his income from promoting the Washington PUDS was earned during 1939, 1940, and 1941, which would seem to place the Commissioner and the petitioner in agreement.

It is therefore our conclusion that as to the Pacific County, Cowlitz County, and Grays Harbor PUDS, the petitioner's income therefrom can not be taxed under the provisions of section 107 of the Code.

To determine whether petitioner's income from the Nebraska districts is taxable under section 107 of the code, a reference to some provisions which are not included in that section will be helpful. For instance, there is nothing in that section which requires that the services rendered shall be exactly of the same character throughout the entire period; or that the contract of employment during said period shall provide for exactly the same amount of compensation; or that the parties to whom the services are rendered shall be limited to exactly the same individuals who were embraced in the original contract for services. Neither is there any requirement in the act that the compensation received must necessarily be paid by the person who receives the most benefit from the services or, in fact, by any person who received any benefit. The requirement simply is that the compensation shall be received.

Let us examine the facts in this case in the light of the above provisions which section 107 does not contain. In 1934 the Nebraska hydros were not self-supporting. The private power companies had their own generating units and were therefore not dependent upon the hydros for power, while on the other hand the private power companies had a monopoly on the distributing facilities, which made the hydros completely dependent upon them for outlet. The private power companies were therefore in a position practically to dictate the rates which they would pay for power. Thus, they were getting all of the profits, the hydros were not self-supporting, and the consumers were getting little benefit. The entire and exclusive purpose for the employment of Myers by the hydros was to get the hydros from under the domination of the private distributing companies by procuring in some way control over the facilities of the distributing companies. The initial plan devised for achieving this purpose was to have the hydros purchase and take title to the distributing companies. From the funds to be raised for this purpose, Myers was to be paid for his services. However, by January 1939 it became apparent that the initial plan could not be carried through, and modification thereof became necessary in order to carry out the basic purpose, which was to get the hydros in a position where they could distribute their own power and become self-supporting. In January 1939 it was found that the hydros could not sell first mortgage bonds on any property acquired by them, and without this power they could not purchase the private facilities. Thereupon the directors of the three hydros, at a joint meeting, selected the directors of one of their groups to organize an additional publicly owned facility for the express purpose of taking title to the properties which the hydros had originally intended to acquire. This new publicly owned utility received little or no benefit from its creation and operation. It was organized purely and solely as an alternative method of carrying out the basic initial purpose, to give relief and survival to the hydros. Consumers was thus created by the hydros and most of its subsequent activities were those of an agent for the hydros. By the creation of Consumers the basic plan to salvage the hydros from private exploitation was carried out after the initial method of accomplishing that purpose proved impracticable.

It is true that Myers did not receive his compensation from the hydros as originally planned. He received it from various districts which Consumers in turn created to facilitate their work. However, in a real sense, it was never possible for Myers to have received his compensation from the hydros, regardless of the terms of his contract, inasmuch as these publicly owned utilities were nonprofit organizations and therefore had no funds out of which Myers could be paid. His compensation ultimately came from the taxpayers and consumers

of the State of Nebraska. When, therefore, he was paid by the various districts of Consumers, which were also publicly owned utilities, it was these same taxpayers and consumers who paid for his services.

The recent case of *James D. Gordon*, 10 T. C. No. 104, gives considerable support to petitioner's contention. In that case the taxpayer was employed to sell stock on a commission to be paid by a vendor. After repeated efforts by the taxpayer covering three and a half years no sale was effected and the taxpayer introduced the vendor to a broker, who in turn entered into a contract with the vendor whereby the broker agreed that the vendee should pay the commission. The sale was made by the new broker and the taxpayer received half of the commission. The Court held that the taxpayer could receive the benefit of section 107 of the code. The analogy between that case and the case at bar is apparent. In the *Gordon* case the original contract, as in the case at bar, provided that the person benefited should pay the compensation, yet the compensation was finally paid by another individual; in the *Gordon* case the initial contract was modified during the period of service, and the instrumentality which brought the service to fruition was not the same as the instrumentality originally designed to complete the work at the beginning of the term of service.

The Commissioner also contends herein that, since the contract of employment covered compensation for all purchases to be made by Myers, and since the taxpayer's income tax returns for 1940, 1941, 1942, 1943, and 1944 show that less than 75 per cent of the total compensation for all purchases made under the basic contracts was received in either 1940 or 1941, therefore, the income for both of these years does not comply with the requirements of section 107, either for 1940 or for 1941.

The Commissioner relies strongly upon *Smart v. Commissioner*, 152 Fed. (2d) 333, in which the taxpayer was a trustee, and as such he had been awarded in 1941 trustees' fees "on corpus for services rendered * * * from May 21, 1933 * * * up until October 7, 1940." In that award he was also allowed fees at the rate of 5 per cent on income collected as trustee from October 31, 1937, to October 15, 1940. The commission awarded on the corpus was less than 75 per cent of the total commissions allowed and the taxpayer sought to separate the two kinds of compensation in order to get the benefit of section 107 in taxing his commission on the corpus of the trust. The Court said: "It is, of course, often possible to divide a trustee's service into entirely separate parts," but the Court held that in the case under consideration a division was not possible and that therefore the taxpayer was not entitled to tax his income as though more than 75 per cent had been received in one year.

However, in the case at bar the services rendered in effecting the various purchases were all clearly separable and distinct projects. The

purchases were all made by separate districts. They were paid for by separate bond issues. The funds of the various districts were all allocated to each particular district's purchases; and Myers was paid by each district when the sale was completed at the rate of 2½ per cent for the first $4,000,000, 1½ per cent for the next $10,000,000 and 1 per cent in excess of $14,000,000. He was not paid by Consumers as though all the purchases were to be added together to constitute one group fund. This case, therefore, clearly presents such a division of services as Judge Hand referred to in the *Smart* case, *supra*.

It is therefore our conclusion that as to the taxpayer's income received from his services in the purchases for the Nebraska districts, he has complied with all of the express requirements of section 107, either as in force in 1940 or as in 1941. He rendered personal services for existing corporations over a period of at least five years and received his compensation for each separable branch of service in one taxable year and in an amount in excess of 95 per cent of the total compensation received. He is therefore entitled to pay taxes on such income under the provisions of section 107 as applicable to the years in which the income was received.

### FINDINGS OF FACT.

In 1913 petitioner married and one daughter has been the issue of such marriage. At that time he was living in Billings, Montana, where he later acquired several residences.

After opening an office in New York City in 1932, he progressively spent more time in that city, where he stopped at various hotels. In 1937 he rented a furnished apartment and Mrs. Myers went with him to New York. In 1939 they moved into an apartment at 30 Sutton Place which they continued to occupy when in New York City until after the taxable years involved herein. Up to 1942 Mrs. Myers spent considerable time in New York where she and Myers entertained their guests, associates, business acquaintances, and their families in their apartment. During 1939 and 1940 Myers and his wife also rented a cottage on Shelter Island, New York, which they occupied during the summer months. Petitioner owned several automobiles at different times while living in New York City, the last of which he sold in New York in 1942. He did not own an automobile in the State of Washington until 1947. He held a driver's license for the States of New York and California, but did not acquire one for the State of Washington until 1947. He belonged to business clubs in New York, Seattle, and Lincoln, Nebraska, and during the taxable years he made charitable contributions, principally to New York organizations, which he deducted from his taxable income. During 1940 he paid an income tax in New York State.

In the fall of 1940 petitioner and his wife and daughter registered with the Board of Elections in New York City for the purpose of voting. In that registration he gave his residence as New York City, where he had been a resident he said for eleven years, and gave his last registration as 1932, when he had registered as a resident of the City and State of New York. Mrs. Myers in her registration gave the period of her residence in New York as four years and her last registration for voting as Billings, Montana, in 1928. Neither petitioner nor his wife registered for voting in the State of Washington until 1943.

When petitioner arrived in Seattle in August 1934, he procured a suite in the Olympic Hotel and he and his wife and daughter stopped at this hotel. He maintained this suite in the Olympic Hotel up until the time of the hearing and paid for it on a monthly basis.

In his publicity and business contracts he gave his residence as 35 Wall Street, New York City.

In 1935 he wrote from Seattle, Washington, to the collector of internal revenue at New York City pertaining to his income tax. In this letter he stated that he had been unable to make out his return accurately because of certain information which he could not get until he returned "home," which would be within sixty days.

From 1934 to 1937 petitioner spent most of his time in the State of Washington. From 1938 on he spent most of his time in New York and Nebraska.

Most of petitioner's books and records have been kept by his secretary in his office in New York City and his income tax returns have either been prepared by, or checked over by, New York City counsel through 1940 and 1941. Petitioner had no office in Seattle until in 1942, when he acquired desk room in the office of a C. P. A. who worked on his books and returns. He owns no furniture or equipment in this office.

In preparing his return for 1940 petitioner consulted his tax advisors in New York and Seattle regarding the very large income received in that year. He was advised to file his returns in the State of Washington on a community property basis. He signed his return for 1940 on August 12, 1941, and it was filed with the collector of internal revenue at Tacoma, Washington. This return was notarized in New York City.

On October 15, 1941, petitioner notified the Tax Commission of Washington State that he had acquired a domicile in Washington, although in 1942 in a financial directory, "The Security Dealers of America," he listed his address as 35 Wall Street, New York City, with a branch in Seattle, Washington.

In the fall of 1941 petitioner procured an option on some land in Washington suitable for raising cranberries and he completed the purchase of this land in 1942. Between that time and the date of the hearing this land had been partially placed under cultivation and petitioner's daughter and her husband had their home on this land.

In his income tax returns which were filed for the years 1937 and 1938, the petitioner deducted from income as "Rent—Seattle, Washington" the cost of his suite of rooms at the Olympic Hotel in Seattle, which amounted to $1,980 for each of those years.

In his return for 1939 petitioner deducted as "Rent, N. Y.—Seattle" the sum of $5,239.83. He rented no quarters in Seattle in that year except the suite at the Olympic Hotel.

Petitioner did not deduct in his returns filed for the years 1938 and 1939 the cost of his New York apartment. Petitioner could not say whether the cost of the Olympic suite for the years 1940 and 1941 was deducted from income in the returns filed for those years.

Respondent determined that petitioner was a resident of New York and was not entitled to file his returns and report his income for 1940 and 1941 on the community property basis.

OPINION.

For one to establish a change in domicile he must show the facts concerning his actual removal to the new domicile and the treatment of the new location as a home, and he must also establish that he had a concurrent intention to make the new place his home. In *Shilkret* v. *Helvering*, 138 Fed. (2d) 925, the court said:

* * * There must be a fixed purpose to remain in the new location permanently or indefinitely. For a domicile once acquired is presumed to continue until it is shown to have been changed, and to show the change two things are indispensable, "First, residence in the new locality; and second, the intention to remain there. * * * Both are alike necessary. Either without the other is insufficient. Mere absence from a fixed home, however long continued, cannot work the change. There must be the animus to change the prior domicile for another. Until the new one is acquired, the old one remains. * * *"

The facts in the *Shilkret* case, involving as they do a removal by a husband and wife from New York City to Hollywood; their leasing of a New York apartment while living in Hollywood; their retention of a voting registration in New York and their failure to vote in Hollywood; their contributions to New York charities and many other facts parallel to those in the case at bar, make the conclusion of the court in the *Shilkret* case that the taxpayer had not removed his domicile from New York to California very persuasive in the case at bar. In fact, although the Commissioner cites this case very promi-

nently in his brief, the petitioner wholly fails to comment on it or to attempt to distinguish it from the case at bar.

Entirely aside from the facts in the case before us concerning petitioner's acts in relation to a Washington domicile, the nebulous state of the mind of the taxpayer himself as to the exact locality of his domicile has created with us a serious doubt as to whether or not the taxpayer at any time until after the taxable years really conceived himself to be a resident of Washington. After he had received the unusually large income payments in 1940 and realized the tax consequences, he conferred with his tax advisors and was advised by them to file his income tax returns on the basis of a domicile in a community property state. This return was signed by him on August 11, 1941. However, even at that time and with the obvious purpose of procuring a tax advantage, in his statement as to domicile attached to his return he does not say clearly and definitely that at any particular time he became a resident of the State of Washington. Certainly such a statement under the circumstances would have been most important as it applied at least to the taxable year. However, the taxpayer in that return stated: "Since August of 1934 I have had no intention of making my home and that of my family in any other state than Washington."

Furthermore, a most important factor in determining whether the taxpayer actually thought he was domiciled in the State of Washington would be the manner in which he treated the expense of the rental of his home for income tax purposes. If he was a resident of New York and his apartment in Seattle was maintained away from his home for purely business purposes, the rental of that apartment would be deductible. Or, if he was a resident of Seattle and his apartment in New York was maintained away from his regular home for business purposes, that would be deductible. But in the case at bar the taxpayer, although he repeatedly testified that he was receiving very high class expert advice on his income tax matters, was unable to testify as to whether the rent deductions in his 1940 and 1941 returns applied to the New York or the Seattle apartment.

Furthermore, although the petitioner testified that he filed a state income tax return in New York for 1940, we have been unable to find anything in the record as to whether or not he filed an income tax return either in Washington or New York for the year 1941.

In *Samuel W. Weis*, 30 B. T. A. 478, the taxpayer and his wife had left their established domicile in New Orleans and had gone to Chicago. The respondent therein contended that by so doing they had changed their domicile from Louisiana, a community property state, to Illinois, and that the taxpayer could no longer have the benefit of dividing his

income for tax purposes with his wife. The Board of Tax Appeals held against the Commissioner and laid down the following considerations which applied to that case and also apply to the case at bar:

(1) The taxpayer had no definite idea of permanence in the Chicago abode when he went to Chicago.

(2) His principal business interests were in Louisiana.

(3) He qualified as a voter in New Orleans and did not attempt to acquire the right to vote in Illinois.

(4) He contributed to Louisiana charities.

(5) In written instruments which he executed in Chicago he described his legal residence as New Orleans, Louisiana.

(6) He filed his income tax returns in New Orleans.

All of the above considerations, with the exception that Myers did file his income tax returns for the two taxable years in question in the State of Washington, would apply to the facts in the case at bar by the substitution of New York for New Orleans and of Washington for Illinois.

In the *Weis* case, however, the Board of Tax Appeals said that in spite of the fact of the presumption of the correctness of all facts necessary to support the Commissioner's determination, the petitioner in that case had overcome that presumption by the facts which he had introduced and he had established the fact that he still retained a domicile in New Orleans in spite of his removal to Chicago. In the case at bar the presumption which follows the Commissioner's determination would, of course, support the petitioner's continued domicile in the State of New York during the taxable years.

After reviewing the entire record in this case, we can only come to the same conclusion as that of the court in the *Shilkret* case, *supra:*

* * * We conclude that petitioner, whatever his honest view—in retrospect—may be, never in fact or in law abandoned his established domicile in New York, nor established a new one in [Seattle].

The respondent correctly determined that petitioner was not entitled to file his returns and report his income for the years 1940 and 1941 on the community property basis.

FINDINGS OF FACT.

Near the beginning of petitioner's association with Ross concerning the Puget Sound Power & Light Co., he became acquainted with Paul H. Nitze, then employed by Dillon, Read & Co. of New York City. Nitze exhibited an interest in the work of Myers and become somewhat familiar with his activities in Washington and Nebraska.

By 1937 Myers had devoted so much of his time to the Washington and .Nebraska projects that his earnings were limited and he had about exhausted his own capital in the expenses resulting from his work. None of the contemplated districts had any power to advance any money to cover Myers' expenses.

In 1937 Nitze terminated his employment with Dillon, Read & Co. and entered Harvard College to do some postgraduate work. He was a man of substantial means and his work at Harvard permitted him some limited time for his own activities. He and Myers entered into an oral agreement whereby Nitze agreed to devote such time as was available to him to assist Myers in his promotional activities and to advance to Myers from time to time amounts to be agreed upon as constituting "the proportionate share of the expenses"; said advancements not to exceed $50,000. Myers agreed in return for these advancements and such other activities as Nitze would perform to pay Nitze 70 per cent of Myers' commissions as they were collected. Myers and Nitze both worked out of Myers' office. Unless the petitioner's promotional work was successful Nitze did not expect any return of any of the money advanced by him. During 1938 and 1939, under this agreement Nitze actually advanced $32,039.69 and he continued working with Myers until late in 1939.

The petitioner used the money advanced by Nitze for the payment of office rent, travel, stenographic services, and other necessary expenses. In 1938 Nitze contributed $20,000 and in 1939, $11,933.38, which sums were reported by Myers as income in his 1938 and 1939 returns, respectively. During those years Myers reported expenses of $22,967.52 for 1938 and $26,032.46 for 1939 and deducted the same from his income. Myers and Nitze kept each other constantly informed as to their activities and the progress of the work.

In the latter part of 1939 Nitze was offered a partnership in Dillon, Read & Co., but as a condition thereof he was required to discontinue all connection with the promotional activities of Myers and to forego any share of the profits thereof which Dillon, Read & Co. considered speculative. Nitze, however, was permitted to accept a repayment by Myers for actual advancements from any commissions which Myers might thereafter earn. As a result, Myers and Nitze modified their original agreement whereby Nitze was to discontinue further activities in association with Myers and was released from his obligation to make any further advancements. He released Myers from his agreement to pay Nitze any part of the commissions earned except a sufficient portion thereof to repay Nitze the $32,674.50 which Nitze had expended. The payments were to be made out of the first commissions earned by Myers. This modification of the original oral agreement was also oral.

The Grays Harbor transaction was closed in 1940 and was the first sale closed by Myers. Out of the commission on that sale Myers repaid Nitze $32,674.50, of which $634.81 had been paid out by Nitze for his own expenses while working on the project. The payment so received by Nitze was regarded by him as a fulfillment of the verbal agreement made by him with Myers in 1939 and Nitze reported the same in his income tax return as resulting in no taxable gain or loss to him.

The Commissioner permitted the deduction of the $634.81 by Myers, but disallowed the balance of $32,039.69. The Commissioner explains this disallowance and others which are not involved in this case as "not representing ordinary and necessary business expense and/or as not being substantiated."

OPINION.

In his petition herein petitioner declared the above disallowance to be in error in the following words:

In 1938 and 1939 petitioner received advances from Paul H. Nitze in sums totaling $32,674.50, which were used to defray ordinary and necessary expenses in petitioner's business. At the insistence of the Commissioner said sums were included in petitioner's income for those years. These sums were repaid to Mr. Nitze in 1940.

On March 22, 1948, and subsequent to the hearing herein, the petitioner was granted leave to amend his petition to conform to the proof and by such amendment added the following:

Petitioner and Paul H. Nitze were joint venturers in negotiations of proposed sales of certain power facilities, and sales of certain power facilities, and Mr. Nitze had an interest in any commissions which might later be received therefrom to the extent of $32,674.50. The first commission was received in 1940 from completion of the Grays Harbor sale. Out of said commission Mr. Nitze was paid his share thereof by the petitioner amounting to $32,674.50 in 1940.

The Commissioner in his answer denied that Nitze and Myers were in a joint venture or that such payment constituted Nitze's share from the joint venture. The Commissioner alleged that all of said payment except $634.81, which the Commissioner had allowed as a business expense, "constituted either a repayment of the advance of that amount previously made by Mr. Nitze or was a payment for the acquisition by petitioner of the interest which Mr. Nitze formerly owned in the joint operations."

We do not think it is necessary to pass upon the petitioner's contention that the initial agreement between him and Nitze was the foundation for a joint venture. Certainly if either party had attempted to enforce the agreement legally, very serious difficulties would have arisen, as there was no arrangement as to how Nitze was

to make the payments or as to what would be considered the "proportionate share of the expenses." There does not seem to be any proportionate relationship between the payments made by Nitze in 1938 and 1939 and the amount of expense incurred by Myers. Furthermore, the record is very indefinite as to just what services Nitze contracted to perform in addition to his advancements of money, and also as to what services he did actually render. Myers apparently did not consider his relationship with Nitze one of joint venture for the reason that he filed no separate returns for the joint venture and treated both the receipts from Nitze and the expenses paid out as elements going to make up his own taxable income. When he failed to mention in his petition anything about a joint venture, in our opinion he was but carrying out the idea which he had always held concerning his relationship with Nitze, which would seem to have been of a nebulous character.

However, if we concede that the petitioner did have a joint venture relationship prior to 1939, it seems to us evident that with the agreement of that year all elements of a joint venture were destroyed, inasmuch as Nitze no longer had any interest in the profits and was only risking a loss to the extent of the money he had already advanced. The petitioner argues that this relationship also constituted a joint venture because there was no relationship of debtor and creditor between Nitze and Myers, inasmuch as Myers was not obligated to pay Nitze anything unless and until profits were made. It is at once apparent that when the 1939 agreement was completed there was no relationship at that time of debtor and creditor. However, there was a contractual relationship between the parties whereby Myers contracted to establish a relationship of debtor and creditor between him and Nitze as soon as profits were received by Myers from his promotional activities. "There is a distinction between a 'debt' and a contract for future indebtedness to be incurred provided the contracting party performs the agreement out of which the debt may arise." *Comfort* v. *City of Tacoma*, 142 Washington 249; 252 Pac. 929.

In 1939, when Nitze withdrew from his former agreement with Myers, Myers entered into a contract with Nitze that if, as, and when he, Myers, received any profits, he would become indebted to Nitze to return the money advanced. Such a relationship is not one of debtor and creditor; nor is it one of joint venture.

Business expenses are deductible in the year in which they are incurred. In the case at bar the expenses were incurred by Myers in 1938 and 1939 and they were deducted by him in those years. The expenses were not incurred in 1940 and are therefore not deductible in that year. The payment made by Myers to Nitze in that year was merely a return of capital to Nitze and when Nitze included this return

of capital in his income tax return with no gain or loss incurred, he correctly handled the item for tax purposes.

Therefore, it is our opinion that the Commissioner correctly disallowed the $32,039.69 paid by Myers to Nitze in 1940 as an item of business expense.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

Disney, *J.*, concurs only in the result.

---

Black, *J.*, dissenting: I dissent from the majority opinion wherein it holds that the compensation which petitioner received from the various divisions of Consumers public power districts in Nebraska should be treated as compensation received for services rendered over a period of five years and thus should be taxed as provided in section 107.

The majority opinion at the outset divides petitioner's services as having been rendered to three groups: (1) Mason County PUD, (2) Grays Harbor, Pacific County, and Cowlitz County PUDS, and (3) the various divisions of Consumers public power districts in Nebraska.

The majority holds that petitioner has proved his case with reference to the commissions which he received from Mason County PUD. I agree with that holding and shall not further discuss it.

The majority opinion next holds that petitioner has not proved his case as to commissions which he received from Grays Harbor, Pacific County, and Cowlitz PUDS. The primary reason for the majority holding as to these commissions is that the public utility districts, which in each of these instances made the purchases in question and when the purchases were completed paid the commissions to petitioner, had not been in existence for as long as five years and therefore under these circumstances section 107 is not applicable. With this holding I am in agreement.

The majority opinion next holds that the compensation which petitioner received from the various divisions of Consumers public power districts in Nebraska was received for services covering a period of more than five years, although concededly the public utility districts which paid these commissions to petitioner had not been in existence for as long as five years in either instance when the purchases were completed and the payments made. The majority opinion reaches this conclusion on the theory that the services which petitioner rendered to the hydros prior to the organization of the purchasing utility districts could be tacked onto the periods of services rendered to the latter and thus extend the services beyond the full five-year period. In reaching this conclusion the majority opinion, among other things, says:

It is true that Myers did not receive his compensation from the hydros as originally planned. He received it from various districts which Consumers in turn created to facilitate their work. However, in a real sense, it was never possible for Myers to have received his compensation from the hydros, regardless of the terms of his contract, inasmuch as these publicly owned utilities were nonprofit organizations and therefore had no funds out of which Myers could be paid. His compensation ultimately came from the taxpayers and consumers of the State of Nebraska. When, therefore, he was paid by the various districts of Consumers, which were also publicly owned utilities, it was these same taxpayers and consumers who paid for his services.

To me the foregoing argument is not at all convincing. If it is sound it might with equal force, it seems to me, have been made with reference to the purchases made by Grays Harbor, Pacific County, and Cowlitz PUDS, as to which a contrary conclusion has been reached in the majority opinion. As I have already stated, I agree with the conclusion reached in the majority opinion as to the compensation received by petitioner from these three PUDS. Finding myself in agreement with the majority opinion as to them and being unable to see any fundamental distinction as to the services rendered to and the payments made by the two groups included in the majority opinion as groups (2) and (3), I respectfully dissent.

––––––––

LEECH, J., dissenting: I respectfully dissent from the conclusion of the majority on issue 3. I disagree with the view that because the receipt by Nitze of the $32,674.50 represented a return of capital to him, the payment of this sum by the petitioner to him must be classed as a capital expenditure. The transaction in which petitioner and Nitze engaged was either a joint venture of both or the venture of petitioner alone. If it was a joint venture—and I think it was—then petitioner and Nitze merely jointly agreed to perform services for commissions. Nitze agreed to contribute the amount, not exceeding $50,000, necessary to defray the cost incurred by the parties in rendering these services. He was to receive from the joint venture a fixed percentage of any net amount realized in commissions. Under a later modification of this agreement Nitze surrendered his right to receive any percentage of the net commissions and in consideration therefor the petitioner released Nitze from his obligation to render the service and agreed that Nitze should be repaid the amount of his advances under the original agreement, $32,674.50, out of the first commissions received.

After the modification of the original contract, commissions were received in 1940 by the petitioner and out of these funds $32,674.50 was paid to Nitze as the portion thereof due him under the modified agreement. This payment of course, as the majority holds, constituted,

as to Nitze, the return of his investment in the joint venture. But when petitioner received these funds, under the modified contract he had no right to keep them. He was bound by the agreement to turn those particular funds over to Nitze. Thus this portion of the 1940 commissions was in fact the property of Nitze when received by petitioner and was therefore not taxable to the petitioner, as his income, as the majority concludes.

If the transaction between petitioner and Nitze was not a joint venture, but a venture of petitioner alone, the same result would follow. Nitze bought from petitioner and owned an asset, i. e., a right to a certain share in particular commissions. In 1940 petitioner bought this asset back at a cost of $32,674.50. During that year and the two following years, all of which are before us here, petitioner fully realized on—in effect disposed of—this asset in an amount in excess of that cost. If such cost can properly be allocated among the several contracts to which commission-sharing agreement applied, it should be so allocated. If not, and I think it can not be so allocated, then upon petitioner's disposition of the asset for an amount exceeding its cost, his gain is not, as the majority holds, the gross amount he received from that disposition. The taxable gain is the amount thus received, reduced by that cost.

The petitioner appears to have included in his individual reported income the $32,674.50 advanced by Nitze and to have taken a deduction in the same amount for its expenditure for ordinary and necessary expenses of the venture. This was clearly an error, but has had no effect for tax purposes because the income has been offset by a deduction in the same amount. It is true that the payment of this $32,674.50 to Nitze by petitioner was not a business expense, but, in my opinion, it is certainly in any event to be reflected in a computation of the net income to petitioner from the 1940 commissions.

BLACK, J., agrees with this dissent.