Norman R. Williams v. Commissioner.
Williams v. Commissioner
Docket No. 25534.
United States Tax Court
1951 Tax Ct. Memo LEXIS 169; 10 T.C.M. (CCH) 633; T.C.M. (RIA) 51207; June 29, 1951
*169 Petitioner, a business broker, received commissions for services rendered in sale of a drop forge plant. The parties disagreed as to when these services began and when they were completed. Held, the services began April 7, 1943, and were completed in July, 1946. Since they covered a period of more than 36 months, respondent erred in refusing to permit the computation of tax on income from such services under section 107 (a) of the Internal Revenue Code. *170 James H. Heffern, Esq., 1300 Genesee Bldg., Buffalo 2, N. Y., for the petitioner. Michael Waris, Jr., Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in petitioner's income tax for the calendar year 1946 in the amount of $2,807.12. The sole issue is whether petitioner was correct in treating commissions which he received during 1946 for the sale of a business as taxable under section 107 (a) of the Internal Revenue Code. Findings of Fact Petitioner is an individual residing in Hamilton, New York. His income tax return for 1946 was filed with the collector of internal revenue for the twenty-first district of New York. Petitioner is a business or industrial broker, his work primarily consisting of acting for clients who wish to sell or buy businesses. He deals either through brokers or the principals themselves and, in most instances, the work carried on is confidential. In 1942 petitioner became aware that Globe Forge, Inc., (hereinafter referred to as Globe) was being offered for sale. By letter dated October 14, 1942, he relayed the information to Harry Barrand, a financial *171 consultant, who had requested petitioner to find a forge plant for him. On October 23, 1942, he learned through Eagan Real Estate, Inc., (hereinafter referred to as Eagan), the broker authorized to sell the property, that an option running until November 30, had been given on a drop forge company (which petitioner knew to be Globe) and that it seemed as if a sale would be realized. Petitioner kept in mind the possible availability of Globe but did nothing further about the sale of any interest until April 7, 1943. On that date petitioner met Dr. Stanley Woodward, also a business broker, in New York City, and learned that the latter was interested in locating a drop forge company which was for sale. Petitioner contacted a representative of Eagan and they met with Woodward to discuss possibilities of a sale of Globe interests. Petitioner began to actively promote the sale of Globe during 1943 working with Woodward in New York, Eagan in Syracuse, and the officers and directors of Globe. In 1944, when negotiations did not seem to be having any success, petitioner contacted E. R. Bishop, president and controlling stockholder of Globe, and made a verbal agreement whereby petitioner would *172 directly act as agent for sale of Bishop's interest in Globe. This agreement was confirmed by letter from petitioner to Bishop on July 24, 1944. Eagan dropped out of the picture but Woodward still continued to represent the buyers. This agreement between petitioner and Bishop was superseded by an option on October 29, 1945, and during the latter part of 1945 petitioner also received options from most other stockholders of Globe to sell their stock in the company. By that time petitioner had options to sell 2720 shares of common and 990 shares of preferred Globe stock out of a total capitalization of 3,000 shares of common and 1,000 shares of preferred stock. Beginning in 1944 negotiations were held with Barium Steel Corporation (hereinafter referred to as Barium) for purchase of the Globe interests, and on November 27, 1945, a written contract was entered into between petitioner, Woodward, and Barium for the purchase of such interests. This contract provided as follows: * * *
"1. Sellers [petitioner and Woodward] hereby agree to sell to Barium 990 shares of Preferred Stock and 2710 shares of Common Stock presently owned or controlled by them for a total price of $435,305, *173 and Barium agrees to purchase said shares upon the terms and conditions hereinafter set forth. "2. Sellers agree to cause to be transferred to Barium 10 shares of the Preferred and 290 shares of the Common Stock of the Company at a total price not to exceed $54,050. Delivery of said shares is to be made by Sellers to Lincoln National Bank of Syracuse not more than thirty (30) days after the date of the closing. Payment of said amount shall be made by Barium as follows: (a) Upon delivery of the shares, Barium shall pay to Sellers in cash or certified check the amount of the actual cost to them of said shares of stock in an amount up to but not in excess of $30,000; (b) The balance thereof shall be made by delivery of shares of the Common Stock, $1.00 par value, of Barium (now in the Treasury of Barium), which shall be valued at the then market price as determined by the last quotation for the stock that day on the New York Curb Exchange, and the remainder, if any, shall be paid in cash in twelve (12) equal monthly installments, commencing on the 1st day of the month following delivery of said shares, and thereafter on the 1st day of each succeeding month. (c) In the event that *174 Barium, after the delivery of the 990 shares of Preferred Stock and 2710 shares of Common stock, may elect to accept less than 100% of the stock of the Company as contracted for hereunder, payments of the amounts set forth in this paragraph pro rated in accordance with the number of shares delivered will be made at such time." The contract designated December 31, 1945, as the closing date, with an option by Barium to make it earlier upon seven days written notice to the sellers. Funds to cover the purchase price of the stock were deposited by Barium in two installments during December, 1945, in a bank in Syracuse. At a meeting at the bank on December 14, 1945, petitioner and Woodward delivered to, and Barium accepted, 990 shares of preferred and 2720 shares of common stock of Globe. This was about 92 1/2 per cent of the Globe stock, and petitioner prevailed upon Barium to take this with a definite understanding that petitioner would obtain the rest and deliver it to Barium. Barium left sufficient money in the bank to cover the outstanding shares and instructed the bank that they would leave it there for a reasonable time and as the stock came in, the bank was authorized to pay *175 for it. Some time during 1946, when all but 35 shares had come in, Barium withdrew the $3,500 still remaining, but informed the bank it could get the money back when needed. In a sale of this type, there are generally a few "tag-enders", a few stockholders who hold out. In this case, by early in 1946, petitioner and Woodward delivered to Barium all the stock which had not been delivered on December 14, except for the holdings of two minority stockholders, consisting of 10 shares of preferred and 25 shares of common stock. Petitioner's agreement with Bishop had provided for a 5 per cent commission and the subsequent option agreements had in effect provided that the sellers would pay the commission for the sale. The contract executed on November 27, 1945, stated commissions would be paid by the seller and that the purchaser was in no way liable to pay any extra amounts as commissions. However, Barium decided it would assume the obligation for such commissions and in January, 1946, Barium delivered shares of its capital stock to the petitioner as commissions. In addition, petitioner received a small amount for some of the remaining 300 shares of Globe stock. The net value of the Barium *176 stock received by petitioner as commissions was $11,252.13. The 10 shares of Globe preferred stock which had not been delivered to Barium were called in in May, 1946. The petitioner worked during the spring and early summer trying to obtain the 25 shares of common stock still outstanding, and also requested Bishop to try and persuade the holder of this stock to sell. Bishop did so and in July, 1946, these last 25 shares of Globe common stock were delivered to Barium in return for payment. Petitioner received no commission for sale of this common stock nor for the preferred stock which was called in. On July 19, 1946, J. A. Sisto, the chairman of Barium, wrote petitioner thanking him for his efforts in securing 100 per cent of the Globe stock for Barium. The respondent determined a deficiency in petitioner's income tax for the year 1946 on the ground that the services rendered by petitioner in obtaining these commissions did not cover a period of 36 months or more. Opinion RICE, Judge: This case involves the narrow question of whether petitioner's services cover a period of 36 months or more, thereby affording the commissions received by petitioner the treatment provided for *177 by section 107 (a) of the Internal Revenue Code. [1] The parties agree the commissions received by petitioner during the taxable year constituted at least 80 per cent of the total compensation received, and that they were for personal services. The Code provides that the period of 36 months is from the beginning to the completion of such services. The parties are not in agreement either as to when the services began or when they were completed. The petitioner *178 argues that the services began in October, 1942. However, we agree with the respondent that the services did not begin until at least April 7, 1943. While prior to that date petitioner was aware of the possibility that Globe interests might be for sale he did no more than write a letter in October, 1942, to a person whom he thought might be interested. He can not be said to have actually engaged or actively attempted to render any services in connection with the sale of the Globe interests until his contact with Woodward in New York City on April 7, 1943. For these reasons we hold that petitioner's services began April 7, 1943. It is immaterial that there was no written agreement between petitioner and Bishop until October, 1945, Guy C. Myers, 11 T.C. 447 (1948); nor that petitioner did not personally deal with Bishop prior to July, 1944, since he was dealing with the authorized agent of Bishop. The petitioner maintains that the date of completion of his services occurred in July, 1946, when the final outstanding 25 shares of Globe common stock were delivered to Barium. The respondent argues that the date of completion was November 27, 1945, at which time the contract *179 was executed between petitioner, Woodward, and Barium, or, at the very latest, in January, 1946, when petitioner was paid his commission. The contract executed November 27, 1945, provided, in part, for the sale of 2710 shares of common stock and 990 shares of preferred stock to Barium. In a separate paragraph the contract also provided for the transfer to Barium of 10 shares of preferred and 290 shares of common stock of Globe, which amount constituted the remaining outstanding shares of Globe stock. We feel that the petitioner's contention is correct and that the date of completion was July, 1946. The contract agreement between petitioner, Woodward, and Barium consisted of two parts. Section 1 concerned the sale of that stock for which petitioner held options. Section 2 referred to the remainder of Globe stock. While Barium had an option to accept less than 100 per cent of the stock, there was no evidence that Barium ever exercised this option. It is quite clear that on December 14, 1945, Barium still wanted 100 percent of Globe stock and there is nothing which indicates that it ever changed its mind. True, in 1946, the $3,500 was withdrawn from the bank in Syracuse, but Barium *180 informed the bank it could get the money back when needed. The fact that petitioner did not receive any commission for the stock is not of any controlling importance. Whether he could have obtained the commission had he litigated the matter, is not before this Court, but the evidence indicates that there might have been a basis for such an action. There is no question but that petitioner did perform services to obtain the stock until July, 1946. In sales of this type a few "tag-enders" are expected, and it is a part of petitioner's job, and important for his reputation, that he work to clear up things. Barium recognized such services in its letter of July 19, 1946. Under all the enumerated facts, plus all others appearing in the record, we hold that petitioner's services were completed in July, 1946, and since they covered a period of more than 36 months, the respondent erred in refusing to permit petitioner to compute the tax on income from such services under section 107 (a) of the Internal Revenue Code. The 1942 amendment to section 107 (a) of the Code, [2] eliminated the requirement that the 80 per cent must be paid only upon completion of the service. *181 Ralph E. Lum, 12 T.C. 375 (1949). However, it provided that the payment received must be pro rated over "that part of the period which precedes the date of such receipt" [Italics supplied].[3] Since in this case, the petitioner in computing his income tax liability did not pro rate the commissions over the period which preceded the date of their receipt, but pro rated them over the entire period of service, from April, 1943, through July, 1946. Decision will be entered under Rule 50. Footnotes
1. SEC. 107. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF THIRTY-SIX MONTHS OR MORE * * * (a) PERSONAL SERVICES. - If at least 80 per centum of the total compensation for personal services covering a period of thirty-six calendar months or more (from the beginning to the completion of such services) is received or accrued in one taxable year by an individual or a partnership, the tax attributable to any part thereof which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual.↩
2. Revenue Act of 1942, section 139. ↩
3. * * * Thus, for example, if an individual commences personal services on July 1, 1941, and completes them on July 1, 1944, and is paid $8,000 for such services on April 1, 1943, he is entitled to the benefits of section 107 (a)↩, provided the $8,000 is at least 80 percent of the total compensation paid or to be paid for such services; and the tax attributable to the $8,000 received in 1943 shall not be greater than the tax attributable to such amount, had it been received ratably over the period from July 1, 1941, to April 1, 1943. * * * (Sen. Rept. No. 1631, 77 Cong., 2d Sess., p. 108).