Abraham E. Kazan and Freda Kazan v. Commissioner.
Kazan v. Commissioner
Docket No. 60371.
United States Tax Court
T.C. Memo 1957-44; 1957 Tax Ct. Memo LEXIS 209; 16 T.C.M. (CCH) 196; T.C.M. (RIA) 57044; March 15, 1957
Phillip I. Blumberg, Esq., for the petitioners. William F. Chapman, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in petitioners' income taxes for 1951 in the amount of $3,474.89. The only issue for decision is whether a payment of $25,000 to petitioner Abraham E. Kazan in 1951 represented at least 80 per cent of the total compensation for personal services covering a period of 36 months or more within the meaning of section 107(a) of the Internal Revenue Code of 1939. Findings of Fact Petitioners, Abraham E. Kazan and Freda Kazan, are husband and wife and reside in the Bronx, New York. They timely filed their joint Federal income tax return for the calendar year 1951 with the collector of internal revenue for the second district of *210 New York. The Commissioner determined a deficiency in their income tax for 1951 based upon the following ground set out in the notice of deficiency: "It is determined that the $25,000.00 received by you and reported on your income tax return as a special fee received from the A. H. Consumers Society, Inc., does not qualify for the tax treatment under Section 107 of the Internal Revenue Code of 1939." All of the income in question was earned by Abraham and he will be referred to hereinafter as petitioner. AmalgamatedHousing Corporation (hereinafter called Amalgamated) is a corporation organized under the Public Housing Law of the State of New York. It owns and operates on cooperative principles a low-rent housing project which at the present time and after the construction hereinafter referred to provides living space for approximately 1,435 families in the Bronx, New York, (hereinafter called the Amalgamated Project). The stock of Amalgamated is owned by the tenant-cooperators residing in the Amalgamated Project. Amalgamated and the Amalgamated Project are under the supervision and regulation of the Commissioner of Housing of the State of New York, pursuant to the provisions *211 of the Public Housing Law. The Amalgamated Project was sponsored by the Amalgamated Clothing Workers Union and was the first project built under the Public Housing Law of the State of New York. It received tax exemption from the City of New York as a non-profit cooperative, providing low-cost housing for wage earners and other persons of low or moderate income. A. H. Consumers Society, Inc. (hereinafter called Consumers) is a corporation organized under the laws of the State of New York on or about February 10, 1937. At all times relevant herein, Consumers conducted, on cooperative principles, a retail distribution business which consisted of the sale of food and groceries to persons residing in the vicinity of the Amalgamated Project, and the sale of milk, electricity, and washing-machine service to the tenant-cooperators of the Amalgamated Project. In addition, Consumers conducted certain social and community activities within the Amalgamated Project. The stock of Consumers is owned by the tenant-cooperators residing in the Amalgamated Project. Gross sales of Consumers were as follows: Food and
Washing
Fiscal Year Ended
Groceries
Electricity
Milk
Machines
11/30/46
$105,343
$37,550
$37,373
8/31/47 (9 mo.)
78,050
29,394
30,754
8/31/48
127,452
39,012
44,209
8/31/49
147,102
39,196
40,373
8/31/50
204,451
50,911
41,670
8/31/51
474,989
65,793
60,797
$4,646
*212 Expenditures of Consumers for social and community activities were as follows: Fiscal Year Ended: 11/30/46
$3,776.20
8/31/47 (9 mo.)
2,608.00
8/31/48
4,221.00
8/31/49
4,858.00
8/31/50
4,969.00
8/31/51
6,894.00
During the period from 1947 to 1951 petitioner was president, general manager, and a director of Consumers. His duties involved general supervision of the corporation's affairs, including overseeing the activities of the employees, and occupied about 1 hour a day of his time. The retail food and grocery business of Consumers was directed by Waldemar Niemela who had 25 or 30 years of experience in the retail food and grocery business. The social and community activities of Consumers were directed by Herman Liebman who had almost 20 years of experience in the field of leading community and social activities in cooperative projects. The milk distribution business of Consumers was directed by Morris Kahn. Niemela, Liebman, and Kahn were all employed by Consumers on a full-time basis. The electricity service business of Consumers consisted solely of "submetering" and the presentation of bills to tenants. With the exception of office clerks, clerical *213 personnel, and help in its retail food and grocery store, Consumers employed no persons during the years 1947 to 1951 except as hereinabove set forth. During the period from 1947 to 1951 petitioner was the only officer of Consumers who received a salary from Consumers. The gross income of Amalgamated from apartment rentals, store rentals, garage rentals, and other sources was as follows: Total Gross
Fiscal Year Ended
Apartments
Stores
Garage
Other
Income
8/31/46
$315,864.15
$7,344.00
$12,321.97
$335,530.12
8/31/47
319,286.50
7,344.00
9,693.79
336,324.29
8/31/48
357,010.50
6,987.00
6,657.69
370,655.19
8/31/49
380,483.00
6,162.00
6,533.97
393,178.97
8/31/50
547,273.00
4,632.00
6,436.14
558,341.14
8/31/51
771,990.00
6,088.00
$24,000
13,221.05
815,299.05
During the period from 1947 to 1951, petitioner was president, general manager, and a director of Amalgamated. His regular duties as such consisted of the supervision of all phases of the general management of the Amalgamated Project, including the collection of rents, the rendition of service to the tenant-cooperators, and the payment of bills and *214 taxes. During the period from 1947 to 1951, Amalgamated employed an assistant manager of the Amalgamated Project to assist petitioner in his duties. With the exception of clerical and office personnel, Amalgamated employed no other persons during the period from 1947 to 1951. In 1947, Amalgamated commenced a major extension to the Amalgamated Project through a massive construction program involving the erection of three 12-story and one 8-story fireproof residential apartment buildings, a power plant for the entire project, and a 300-car garage. The apartment buildings provided accommodations for approximately 755 families and increased the capacity of the Amalgamated Project to approximately 1,435 families. As required by the Public Housing Law, the construction of this extension to the Amalgamated Project (hereinafter called the Extension) was approved by the Commissioner of Housing of the State of New York. The total cost of construction of the Extension was $7,976,459.98. Amalgamated decided to construct the Extension through a general contractor rather than directly in order to remove the construction details from the supervision of the Commissioner of Housing, and to insulate *215 Amalgamated from financial responsibility. Amalgamated and Consumers entered into a contract dated December 14, 1948. Under this contract Consumers agreed "as general contractor, to perform or cause to be performed" all the work required for the construction of the Extension. Consumers commenced its work as general contractor of the Extension in 1947. Petitioner worked with the architect and engineers in 1947 to lay out the entire development prior to the breaking of ground and the beginning of actual construction early in 1948. Consumers in 1947 set up an office to receive subscriptions for the dwellings, to receive payments for same, to process applications, and to perform similar functions. As general contractor for the construction of the Extension, Consumers negotiated and entered into contracts with subcontractors representing the 35 to 40 trades required for the construction, coordinated the work of the various subcontractors, supervised the performance of subcontractors in order to assure conformance with the plans and specifications annexed to the respective contracts, and saw to the payment of the subcontractors upon the satisfactory completion of their duties. Negotiation *216 with between 105 to 120 subcontractors, or approximately three times as many subcontractors as were finally needed, was required before the necessary subcontracts for the construction of the Extension could be consummated. Petitioner, on behalf of Consumers, discharged all of the duties which Consumers had undertaken to perform as general contractor of the Extension. These duties required fully one-half of his time during the period from 1947 to 1951. The work undertaken by petitioner on behalf of Consumers in connection with the construction of the Extension was separate and distinct from his ordinary or regular duties as an officer of Consumers and as an officer of Amalgamated. It was petitioner's understanding that, upon completion of the construction of the Extension, he would receive additional compensation from Consumers for the special services performed by him in connection with such construction in such amount as the board of directors of Consumers might determine. To assist petitioner in his duties in connection with the construction of the Extension, Consumers employed a construction superintendent, who was paid approximately $10,000 or $11,000 per year. The construction *217 superintendent was an on-the-job foreman who worked under petitioner's supervision coordinating the work of the subcontractors, but had no ultimate responsibility for decisions. The minutes of a special joint meeting of the board of directors of Consumers and the house committee of the Amalgamated Project, held on January 25, 1951, contained in the minute book of Consumers, duly record the following discussion and action: "The chairman then asks Mr. Kazan to leave the meeting, after which he informs the members that a member of the Board of Directors, Mr. Szold, was to appear before the body to urge consideration of compensation to Mr. Kazan for the years of the construction period and also to increase his salary for the future. Unfortunately, Mr. Szold has taken ill and cannot appear, tonight. And, since it is probable that the government might freeze wages any day now, we cannot wait for any future meeting and must act tonight. "In the discussion that follows it is brought out that Mr. Kazan, by his ability, diligence and individual effort, has saved our Cooperative on construction alone tens of thousands of dollars. This was a job done over and above his duties as Manager. *218 The opinion was unanimous that Mr. Kazan should be compensated for the years during which he planned and supervised the building of new additions to our community. However, the majority felt that we should separate the 2 items. The future salary of our Manager should not be tied in with compensation for the construction period. The chair so ruled. "On the matter of compensation, the meeting decides that the sum of $25,000.00 should be given to Mr. Kazan. That is at the rate of $5,000.00 per year, covering the years 1947, 48, 49, 50, and 51." The sum of $25,000 was paid by Consumers to petitioner on May 12, 1951, and he reported this amount in his income tax return for 1951 as a special fee for construction services allocated over the 52 months from January 2, 1947, to May 2, 1951, in accordance with the provisions of section 107 of the Internal Revenue Code of 1939. The $25,000 paid to petitioner was included in the cost of construction of the Extension charged by Consumers to Amalgamated. The house committee of the Amalgamated Project consisted of from 5 to 9 residents of the Amalgamated Project, elected by their fellow tenant-cooperators. It was an advisory group without *219 legal authority. The house committee sometimes met jointly with the board of directors of Consumers, but never met jointly with the board of directors of Amalgamated. On January 25, 1951, the officers and members of the board of directors of Consumers, and the officers and members of the board of directors and members of the house committee of the Amalgamated Project were as follows: Board of Directors
Office
Consumers
Amalgamated
Consumers
President
Abraham E. Kazan
Abraham E. Kazan
Abraham E. Kazan
Vice President
Max Bluestein
Robert Szold
Robert Szold
Secretary
Michael Shallin
Michael Shallin
Irving Schuldenfrei
Treasurer
Michael Shallin
Jacob S. Potofsky
Irving McKible
Max Bluestein
Ida Vozick
Sol Blackman
Rose Urkowitz
Isidore Shapiro
Board of Directors
House Committee
Office
Amalgamated
Amalgamated Project
President
Abraham E. Kazan
David Maness
Vice President
Robert Szold
Jack Miller
Secretary
Jacob S. Potofsky
Paul Schuldenfrei
Treasurer
Irving Michael Atkin
David Weinstein
Aaron Teraspulsky
Israel Breslow
Israel Ostroff
Seymour Klanfer
Loula Lasker
Moe Tamarken
Isidore Wachtel
*220 During 1951 petitioner received the following sums as compensation for services rendered from the following corporations: Company
Location of Project
Position
Amount
Amalgamated
The Bronx, New York
President, General
Manager, and
City
Director
$6,825.00
Consumers
The Bronx, New York
President, General
Manager, and
City
Director
5,675.07
Amalgamated Dwell-
Lower East Side, New
Vice President, General
Manager,
ings, Inc.
York City (Housing
and Director
4,674.96
Company)
Hillman Housing Cor-
Lower East Side, New
Vice President, General
Manager,
poration
York City (Housing
and Director
6,000.00
Company)
A.D. Cooperative Serv-
Lower East Side, New
President, General
Manager, and
ices, Inc.
York City (Food
Director
275.00
Store)
A temporary certificate of occupancy pertaining to building No. 12 of the Extension was issued by the Department of Housing and Buildings, Borough of The Bronx, City of New York, dated June 29, 1951. Building No. 12 contained 8 stories and was the last unit of the Extension to be completed. In connection with the construction, in 1926 or 1927, of buildings 1 to 6 *221 of the Amalgamated Project, containing 303 family units, the firm of Brodsky & Klosh was hired to supervise construction and to perform the other duties which petitioner performed in connection with the construction of the Extension. It was paid a fee for such services. From 1929 to 1931 Amalgamated added 2 more buildings to its housing project, to wit: buildings 7 and 9, containing 220 and 115 family units, respectively. In the construction of buildings 7 and 9 the firm of Benjamin Raymond was hired by Amalgamated to supervise construction and to perform the other duties which petitioner performed in connection with the construction of the Extension. This firm was also paid a fee for such services. Amalgamated Dwellings is a cooperative housing project, containing 236 family units, located on the lower east side of Manhattan. It was constructed in 1929 and 1930. Like Amalgamated, Amalgamated Dwellings was constructed under the Public Housing Law, received tax exemption from the City of New York, and was sponsored by the Amalgamated Clothing Workers Union. In connection with the construction of Amalgamated Dwellings, the firm of Benjamin Raymond was hired to supervise construction *222 and to perform the other duties which petitioner performed in connection with the construction of the Extension. In 1941 Amalgamated added building 10 of the Amalgamated Project, containing 48 family units. After World War II, Amalgamated added building 11 of the Amalgamated Project, containing 30 family units to take care of the veterans of the community. Petitioner supervised the construction of these buildings and did not receive extra compensation therefor. Petitioner's duties as vice president, general manager, and director of Amalgamated Dwellings, Inc. were similar to those which he performed for Amalgamated, that is, they consisted of the duties of a general real estate manager. Petitioner's duties as vice president, general manager, and director of Hillman Housing Corporation were similar to those which he performed for Amalgamated Dwellings, Inc. His duties as president, general manager, and director of A.D. Cooperative Services, Inc., which conducted a milk and electricity distribution business in the Amalgamated Dwellings Project, were the same as his duties with Consumers. The personal services rendered by petitioner in supervising the construction of the Extension *223 to the Amalgamated Project and the $25,000 special fee received therefor were separate, distinct, and severable from his regular duties and compensation as an officer, director, and general manager of Amalgamated and of Consumers. These services covered a period commencing not later than December 31, 1947, and continuing until at least May 12, 1951. Opinion KERN, Judge: During the period 1947 through 1951, petitioner was the president and general manager of a low-cost cooperative housing project (Amalgamated) and of a separate cooperative (Consumers) organized for the purpose of carrying on a retail food and grocery business for the residents of the project and of the immediate neighborhood. He was also an officer and director of other housing projects not here involved. His duties with Amalgamated and Consumers involved general supervision of their affairs including the supervision of full-time employees in charge of the various services being rendered. He saw to the proper maintenance of the buildings, the payment of bills, the negotiation of union contracts, and, on at least one occasion, the negotiation of a mortgage extension. Amalgamated was organized under Article IX of *224 Public Housing Law of the State of New York (Chapter 44-A of the Consolidated Laws of New York) and its affairs were closely supervised by the State Commissioner of Housing. This official's approval of the financial arrangements, construction plans, specifications, and estimated costs was required before Amalgamated could undertake any construction projects. Between 1947 and 1951 Amalgamated built an addition which cost almost $8,000,000 and which approximately doubled the project's capacity. Consumers, by a contract dated December 14, 1948, agreed to act as general contractor for Amalgamated in the construction of the Extension. Petitioner actually performed the work required of a general contractor, negotiating contracts with some 35 or 40 subcontractors of various trades who did the actual building work, hiring and supervising a construction superintendent who was responsible for keeping the work flowing smoothly, and taking the over-all responsibility for the satisfactory completion of the project. On May 12, 1951, petitioner was paid $25,000 by Consumers pursuant to a resolution of its board of directors at a meeting held on January 25, 1951, which stated that such payment *225 was compensation for the years during which he planned and supervised the building of the new additions to the project. Petitioner reported the receipt of this sum in his 1951 Federal income tax return for construction services and allocated it over the 52 months from January 1, 1947, to May 12, 1951, claiming that he was entitled to the benefits of the spreadback provision of section 107(a) of the Internal Revenue Code of 1939. Respondent determined the deficiency herein on the ground that petitioner was not entitled to so treat the special fee. Respondent makes two arguments in support of his determination. He contends that: 1. Petitioner's duties as president and general manager of Amalgamated and Consumers encompassed the services he performed in supervising the construction of the Extension and that such services were not divisible from his regular duties so that the $25,000 special fee did not constitute 80 per cent of the total compensation for personal services received by him during the period in question. 2. The period of service was only from December 14, 1948, when Amalgamated and Consumers entered into their formal written contract until no later than June 29, 1951, when *226 a temporary certificate of occupancy was issued for the last unit to be completed, a period of less than 36 months. Respondent's first argument is without merit. It seems perfectly obvious to us that there was a vast difference in the services being rendered by petitioner to Amalgamated and Consumers in managing their rental housing and retail grocery affairs, respectively, and his over-all supervision of the construction of an $8,000,000 addition to the Amalgamated Project, which required him to negotiate with over 100 construction subcontractors, select the 35 or 40 needed, and supervise the progress of their work. Petitioner's delegation of the day-to-day, on-the-job supervision of the construction work to a full-time construction superintendent, who was paid between $10,000 and $11,000 per annum but who was responsible to petitioner, is some indication of the responsibility petitioner bore. It would serve no purpose to belabor this point. We have found as a fact that petitioner's services in supervising the construction of the Extension and the $25,000 compensation therefor were separate, distinct, and severable from his regular duties and compensation. Estate of Marion B. Pierce, 24 T.C. 95; *227 Leon R. Jillson, 22 T.C. 1101; E. A. Terrell, 14 T.C. 572. The cases cited by respondent are distinguishable upon their facts which failed to establish that the taxpayers rendered special services severable from those for which they were entitled to regular compensation. There is nothing to show that petitioner dominated the affairs of either Amalgamated or Consumers and, hence, Lucilla De V. Whitman, 12 T.C. 324, affd. (C.A. 2, 1949) 178 Fed. (2d) 913, cited by respondent, is not in point. Respondent's alternative argument is that even if the special fee was otherwise a payment falling within the provisions of section 107(a), petitioner cannot claim the benefits of this section on the ground that the services rendered did not cover a period of 36 or more months. He contends that petitioner described the payment as a fee for "services performed as Supervising General Contractor" and that the contract between Amalgamated and Consumers, whereby the latter agreed to serve as general contractor, was dated December 14, 1948, approximately 30 months prior to June 29, 1951, the latest date upon which the services might be considered as *228 completed. It is respondent's position that petitioner could not have been delegated the duties of general contractor by Consumers prior to the time that the latter became responsible for the work. No authority was cited by respondent in support of his contention. The contract of December 14, 1948, between Amalgamated and Consumers refers to another agreement between them entered into on June 6, 1947, "whereby Consumers Society agreed to convey the real property acquired by Consumers Society for the extension of the project of the Housing Company at a price equal to the total actual final value thereof, subject to the approval of the State Commissioner of Housing." This indicates that preparatory work was being done on the expansion project in 1947 and corroborates the following uncontradicted testimony given by petitioner at the hearing: "Q. Approximately when did Consumers commence work with respect to its job relating to the construction of the extension of the Amalgamated Housing Project? "A. Actual work started in 1947. Prior to the breaking of ground and actual construction, we had to work with the Architect and Engineers to lay out this entire development. "We also had *229 to set up an office to receive the subscriptions for these dwellings, receive the money from the people, process the applications, and so forth, but ground was broken afterwards, some time in early 1948. "Q. And the work that you are describing was work done by Consumer's or Amalgamated? "A. All the work was done by Consumer's." The minutes of the meeting of the board of directors of Consumers held on January 25, 1951, jointly with the house committee of Amalgamated, state that: "The opinion was unanimous that Mr. Kazan should be compensated for the years during which he planned and supervised the building of new additions to our community." The minutes further state that the compensation covered the years 1947 through 1951. The stock of Amalgamated and of Consumers was owned by the tenant-cooperators who resided in the Amalgamated Project. It is obvious that the two organizations, owned by and serving the same people, cooperated in the construction of the addition. We are satisfied that petitioner rendered personal services in connection with the preliminary and planning work carried on in 1947 and was compensated therefor by Consumers as well as for the construction period *230 1948 to 1951. We do not view the date of the formal contract between Amalgamated and Consumers or the fact that some of the benefits may have been received by Amalgamated although paid for by Consumers as determinative of the question before us. See James D. Gordon, 10 T.C. 772, affd. per curiam (C.A. 2, 1949) 172 Fed. (2d) 864; Guy C. Myers, 11 T.C. 447. Both Amalgamated and Consumers were in existence in the period 1947 through 1951 and petitioner's services were rendered in connection with what the parties have stipulated to be "a massive * * * program" in which both were vitally interested. We hold that the special fee of $25,000 received by petitioner on May 12, 1951, was at least 80 per cent of the total compensation for personal services covering a period of more than 36 calendar months from the beginning to the completion of such services. The period covered was at least from January 1, 1948, to May 12, 1951, 40 months. Although the record establishes that the petitioner's services commenced in 1947, there is no evidence as to when in that year he commenced working on the addition to the Amalgamated Project, and we cannot find that the *231 work commenced on a specific date prior to December 31, 1947. Perhaps the parties under a Rule 50 computation can agree upon an earlier starting date. Decision will be entered under Rule 50.