CHARLES O. FINLEY, SHIRLEY FINLEY, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CALVIN L. SMITH, THELMA F. SMITH, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 58664, 58665. Filed January 29, 1960.

*Lester M. Ponder, Esq.*, and *William P. Wooden, Esq.*, for the petitioners.

*Robert E. Johnson, Esq.*, for the respondent.

TRAIN, *Judge:* The respondent determined deficiencies in income tax and additions to tax for 1952 as follows:

| Docket No. | Deficiency | Additions to tax 294(d)(1)(A) | 294(d)(2) |
|---|---|---|---|
| 58664 (Charles O. and Shirley Finley) | $83,696.32 | | |
| 58665 (Calvin L. and Thelma F. Smith) | 85,496.05 | $13,135.76 | $7,881.45 |

The issues for decision are:

(1) Whether Finley and Smith, as partners, are entitled to allocate income of $441,563.22 received from Continental Casualty Company in 1952, as accident and health group insurance commissions,

ratably over the years 1946 to 1952, inclusive, pursuant to section 107(a) of the Internal Revenue Code of 1939;

(2) Whether petitioners' partnership expended for printing, in 1952, $25,629.52 or any amount in excess of that claimed on the 1952 partnership return; and

(3) Whether petitioners Smith are liable for additions to tax under sections 294(d)(1)(A) and (d)(2).

### FINDINGS OF FACT.

Charles O. Finley (hereinafter referred to as Finley), and Shirley Finley are husband and wife who reside at Gary, Indiana. They filed a joint Federal income tax return for the calendar year 1952 with the district director of internal revenue, Indianapolis, Indiana.

Calvin L. Smith (hereinafter referred to as Smith) and Thelma F. Smith are husband and wife who reside at Los Angeles, California. They filed a joint Federal income tax return for the calendar year 1952 with the district director of internal revenue, Indianapolis, Indiana.

Finley and Smith are brothers-in-law.

Finley, after graduating from high school in 1936, worked in Gary, Indiana, steel mills until 1941. After leaving the steel mills, he was employed by the Kingsbury Ordnance Plant in Michigan City, Indiana, until September 1945. Late in 1941, Finley, on the side, started selling life insurance and continued as a part-time life insurance agent until the end of 1945. On September 28, 1945, Finley, after leaving Kingsbury, became a full-time agent and sales representative for the Travelers Insurance Company, a life, accident, and group insurance company of Hartford, Connecticut, in the Lake County, Indiana, area.

Finley, while with Travelers in 1946, wrote more health and accident insurance policies than had ever been written in the previous history of the company by one man. These policies were written on an individual basis with doctors exclusively and could be canceled by the company at any time. The accident insurance policy written by Finley paid lifetime benefits and the health policy paid 1-year sickness benefits. Finley remained an agent for Travelers until December 1947 but did not continue life insurance sales work in 1947. On December 17, 1946, he entered the James D. Parramore Hospital, Crown Point, Indiana, with a diagnosis of advanced pulmonary tuberculosis. He was confined in the hospital until November 30, 1947.

During the first 3 or 4 months that Finley was in the sanatorium, a competing insurance agent from Chicago sold a group policy throughout Finley's territory that paid 5-year benefits for accidents

and 2-year benefits for sickness. About 80 per cent of the doctors with respect to whom Finley had written policies dropped their individual policies with him in favor of the group policy of his competitor. The loss of this business started Finley thinking about how to get it back, and it was at this time that he began to consider the idea of a group insurance policy for the members of the medical profession that would provide lifetime benefits for accident and a minimum of 5-year benefits for sickness. In the course of developing this idea, while in the hospital, Finley studied books, periodicals, and statistics on the past experience of insurance companies relative to accident and health group insurance. These various activities with respect to his idea took up most of Finley's spare time at the hospital, up to about 5 hours daily. The head nurse kept telling Finley that studying these books would delay his recovery, and Finley then studied his books furtively. After about 6 months, the superintendent of the hospital took all of his books away from Finley. His brother-in-law, Smith, visited Finley in the hospital, and Finley told him about the group plan that he had in mind. Finley explained to Smith that the only policies available for professional groups at the time were ones limited in scope and that a program of long-term coverage for sickness and accident would receive wide acceptance if an insurance company could be found which would underwrite the policies.

Thereafter, in October 1947, Smith, who had never before been in the insurance business, returned to Birmingham, Alabama, where he began to sell insurance for Prudential Insurance Company and later for Massachusetts Protective and Paul Revere Life Insurance Company, continuing until the early part of 1949.

Finley was released from the hospital on November 30, 1947, and spent the next 14 months recuperating at home. During the first 6 or 7 months of this latter period, it was his practice to spend 1 or 2 hours a day selling insurance and then to return to bed. However, about 2 months after his discharge from the sanatorium, Finley took his wife to Hartford, Connecticut, to talk to the president of Travelers Insurance Company about writing the type of insurance which he had in mind (group insurance for members of the medical profession, providing lifetime accident benefits and a minimum of 5-year benefits for sickness). Upon Travelers declining to underwrite such a policy, Finley went to Boston and talked with the president of Massachusetts Casualty Insurance Company to try to interest that company in writing such a policy but was again unsuccessful.

Similarly, in the spring of 1948, Finley talked unsuccessfully to the president and executive vice president of North American Accident Insurance about such a policy. Likewise, in 1948, Finley un-

successfully contacted the vice president of Provident Life and Accident Insurance Company of Chattanooga, Tennessee, and the executive vice president of the Washington National Insurance Company of Evanston, Illinois, about his plan. Also, in 1948, Finley asked Washington National Insurance Company to quote on a 5- and 7-year sickness coverage and lifetime indemnity for accidents.

Smith moved to Gary, Indiana, and he and Finley formed an equal partnership on January 1, 1949, known as Charles O. Finley and Company to engage in the insurance brokerage business and specialize in group plans for county and State professional associations, particularly medical associations and societies. The partnership agreement was oral. The partnership established two offices, one at 504 Broadway, Gary, Indiana, and the other at 310 South Michigan Avenue, Chicago, Illinois. At this time, Finley was still confined to his home part of the time. An important factor leading to the formation of the partnership was Finley's realization that his physical condition upon his release from the hospital would necessitate the assistance of a business associate in whom he had confidence.

Charles O. Finley and Company sold group accident and health insurance plans to professional associations. The first group coverage was for the Lake County Medical Society in Gary, Indiana, for which 5-year accident and 2-year sickness insurance effective May 1, 1949, was underwritten by Provident Life and Accident Insurance Company. Shortly thereafter in 1949, Charles O. Finley and Company sold group insurance to the La Porte County Medical Society of Indiana; St. Joseph County Medical Society of Indiana; The Northwest Indiana Dental Society of Indiana; and several other county medical societies in Indiana. Also, during 1949 and 1950, Finley and Smith continued to contact the insurance companies referred to above and endeavored without success to interest them in underwriting accident and health group insurance in line with the plan developed by Finley while in the hospital. No written plans were presented to the companies on these occasions. During these years, including 1948, it was the practice in the insurance industry to write 5-year accident and 2-year sickness group insurance policies. No company was writing group policies providing the longer benefits contained in the plan which Finley and Smith were trying to sell. One reason for the reluctance to write such a policy was the fear that the longer duration of benefits would encourage malingering and early retirement and that the benefits would exceed the premiums that could be charged. Finley predicated his plan on limiting the coverage of such a policy to a group whose income level and ethical standards would minimize those dangers.

In the spring of 1951, Finley first contacted Continental Casualty Company of Chicago by going to the office of Paul S. Fisher, superintendent, Association Group Division, and assistant vice president. Continental Casualty Company, the largest writer of accident-health insurance among stock companies, had underwritten group coverage for a professional society prior to 1951, once on a nationwide basis. Fisher told Finley that Continental would like to make proposals on any group plans he might have in mind but that Continental was limited to a 2-year benefit on sickness. There were several meetings in mid-1951 between Finley and Fisher, but, at that time, Finley was not able to interest Fisher or Continental in underwriting a group plan on a much longer term. The company declined to underwrite any such plan for Finley.

In the spring of 1951, Finley first obtained an introduction to Major General Paul R. Hawley, director of the American College of Surgeons, through Dr. Sesnick of South Bend, Indiana, former president of the American Medical Association. At his meeting with Hawley, Finley first proposed that he undertake the formation of an insurance group within the American College of Surgeons to provide lifetime benefits for disability from accidents and 2-year benefits for sickness. Hawley stated such a policy for professional groups was very common and that the Fellows of the college were able to procure such coverage from other sources, such as their local medical societies. He stated that he would not place that type of proposal before the board of regents of the American College of Surgeons. However, Hawley declared that he would consider any further proposal that Finley might make, and Finley asked for time to explore the situation as to whether or not he could obtain broader benefits because of the unusually select quality of membership of the American College of Surgeons. In the early summer of 1951, Finley came back to Hawley with another proposal to be underwritten by North American Accident Insurance Company (hereafter referred to as North American), which would provide benefits from illness for 5 years instead of the 2 years referred to in Finley's previous plan and which would provide for different premium rates.

The board of regents of the American College of Surgeons next met in San Francisco on November 2, 3, and 4, 1951, and Hawley placed Finley's proposal before them. Finley also appeared before the board of regents and made a personal presentation of his plans. The board of regents decided to postpone action until after it received a recommendation from the board of governors of the American College of Surgeons. On November 4, 1951, Finley appeared before the board of governors and was questioned at length regarding the proposal. Thereafter, on the basis of the board of

governor's favorable recommendation, the board of regents approved the plan presented by Finley. The resolution of approval required that all members of the American College of Surgeons, both American and Canadian, be included in the program.

North American had never applied for admission to do business in the Dominion of Canada or any of the provinces thereof though it was admitted to do business in all 48 States in the United States and the District of Columbia. In working with Finley and in turn through him with the American College of Surgeons, North American anticipated that, in the event the resolution called for inclusion of the Canadian members, such coverage could be reinsured with a company doing business in the Dominion of Canada. However, North American could not find a carrier willing to accept that portion of the business only and so advised Hawley by letter dated November 28, 1951.

In the meantime, Finley contacted Continental Casualty Company (hereafter referred to as Continental), which had refused previously to underwrite the American College of Surgeons program. Finley described the above events to Continental's representative, Fisher. The latter went to the president of Continental and received approval to underwrite the program for the American College of Surgeons.

On November 20, 1951, Fisher mailed a letter to Finley which stated as follows:

You are hereby authorized to amend the proposal we submitted to you for a Group Plan of Disability Insurance for the members of the American College of Surgeons as follows:

1. Sickness Indemnity to be payable for 260 weeks instead of 104 weeks, with Indemnity terminating at age 72.

2. Accident Indemnity to be on a life time basis instead of being limited to the first five years of disability.

3. 50 per cent Indemnity will be paid, up to four weeks, for partial disability caused by accidental injury.

4. Principal Sum to be $5000 instead of $1000.

5. Premium Schedule to be amended as follows:

| Plan | Weekly Indemnity | Principal Sum | Premiums | |
|---|---|---|---|---|
| | | | Annual | Semi-Annual |
| A | $100.00 | $5,000.00 | $210.00 | $105.50 |
| B | 75.00 | 5,000.00 | 160.00 | 80.50 |
| C | 50.00 | 5,000.00 | 110.00 | 55.50 |

6. In addition to the above, each acceptable member will have the option of adding a hospital rider which pays $10 per day while the insured is confined in a hospital, up to 60 days, for an additional premium of $12 per year or $6.00 semi-annually.

I am sorry that it was impossible for us to contact you in time to get this information in your hands before you went to San Francisco. Naturally, we preferred to present our standard Plan in accordance with our first proposal but we are willing to give these longer term Indemnities at a proportionate increase in rate, if that is what the College of Surgeons prefers.

As you know, Continental Casualty Company is not only an outstanding leader in the Accident and Health field but is also a pioneer with more than 27 years of nation-wide experience in this highly specialized field of Professional Group Insurance. It seems to me entirely fitting and proper that you should choose a company of Continental's caliber to underwrite the Group Insurance Plan for one of America's largest and foremost professional organizations. I am sure we can help you do a job that will be the pride of all parties concerned.

You may consider this letter as our commitment to go on the risk on the basis outlined. All we need now for the issuance of the master contract is the proper execution of the enclosed master application.

Thereafter, Finley went to the meeting of the board of regents of the American College of Surgeons at White Sulphur Springs, West Virginia, and presented the above program to be underwritten by Continental. With the amendments set out in Fisher's letter quoted above, the plan agreed to by Continental was identical in every respect to that which the board of regents previously had approved. The board now gave its approval to the program outlined by Continental.

On November 21, 1951, Hawley sent the following letter to Charles O. Finley and Company which was later signed by Finley and Smith on behalf of the partnership:

The undersigned association hereby designates Charles O. Finley and Calvin L. Smith, representing the Charles O. Finley & Company, as the brokers to represent it, and each member hereof in the procuring and placing of group insurance with the Continental Casualty Company of Chicago for members of the undersigned association.

This agreement shall remain in full force and effect unless cancelled by mutual consent or cancelled on any anniversary date by one year's notice in writing prior to such anniversary date hereof.

The American College of Surgeons has never paid or loaned any amounts of money to Charles O. Finley and Company or the individual partners.

On November 28, 1951, Finley sent a letter to Hawley which stated:

With the Board of Regents' permission we would like to change the Insurance Carrier of the American College of Surgeons' Group Insurance Program from the North American Accident Insurance Company to the Continental Casualty Company.

The reason for this request is that the North American was unable to find an Insurance Company doing business in Canada to insure, through reinsurance, the Canadian Fellows. Enclosed is a letter from the President of the North American Insurance Company, addressed to you, expressing his regrets. We had been assured from the beginning, by the North American Insurance

Company, that there would be no difficulty in locating such a company to reinsure with. However, when the companies contacted learned of the small number of Canadian Fellows involved and the red tape necessary in international reinsurance agreements they were not interested.

The Continental Casualty Company is America's No. 1 accident and sickness insurance company and does business in all forty-eight states including the District of Columbia, all provinces of Canada and all United States possessions. The company has local claim offices in every principal city throughout this territory.

The reason the Continental Casualty Company's *original bid* was not presented to the Board of Regents in San Francisco was because at that time their bid was not in line with the North American bid in regards to long term coverage—lifetime benefits for accidents and five-year benefits for sickness.

The Continental Casualty Company's *amended bid* is identical in every respect, including the coverage, premium and solicitation agreement to that of the North American bid.

Enclosed is a letter from the Continental Casualty Company confirming the above.

I am pleased to have been able to obtain the Continental Casualty Company as the underwriter. Continental Casualty Company is not only an outstanding leader in the accident and health field but is also a pioneer with more than twenty-seven years of nation-wide experience in this highly specialized field of professional groups disability insurance.

Trusting the change in companies will meet with the approval of the Board of Regents, I am,

On December 3, 1951, the American College of Surgeons made application to Continental for group plan insurance and a master policy 1–A–0217 was issued effective April 1, 1952. Under the policy, either Continental or the American College of Surgeons could terminate the policy as of April 1 of any year after 1952 by giving written notice to the other party 60 days prior to the terminate date.

On February 28, 1952, Finley and Smith, doing business as Charles O. Finley and Company, entered into the following agreement with Continental regarding the above policy No. 1–A–0217:

The above Group Policy is subject to the following commission agreements:

1. The Company will pay you a commission of 27½% on the net premiums received by it during the first policy year including the first full year of net premiums received on all new additions to the Group after April 1, 1952. "Net Premiums" as used herein means gross premiums less any returns or refunds made to insured Fellows for any reason.

2. The Company will pay you a commission of 15% on all such renewal premiums collected, provided, however, the Company will pay only 10% during the second, third, and fourth policy year. The other 5% shall be held in reserve by the Company, subject to the following further agreements. Renewal premiums shall include premiums after the first full year from the effective date as to each individual Insured.

3. If at the end of the fourth policy year incurred losses are 65% or less of the earned premiums for said first four policy years, the 5% commission retained by the Company shall be subject to your order and may be withdrawn

either in one sum or at your option in installments over a period of years as you may direct the Company.

4. If at the end of the first four policy years the incurred losses shall exceed 65% of the earned premiums for such years, the Company will retain the 5% commission applicable to the second, third and fourth policy years, provided, however, that if this agreement continues in force a statement of incurred losses shall be prepared at the end of each subsequent policy year and if at any time such recomputation indicates the incurred losses from the effective date of the policy to the end of such policy year shall not exceed 65% of the earned premiums for such period, then the Company will pay to you as provided in Paragraph 2 the 5% commission for the second, third and fourth policy years previously retained by it. During the continuance of this contract renewal commissions shall be paid at the rate of 15% as premiums are received during the fifth and subsequent policy years.

"Incurred Losses" as used herein shall mean claims actually paid plus the Company's estimated reserves on claims incurred and unpaid on the last day of any policy year under accounting.

5. It is understood and agreed that premium collections under the above policy shall be made by you and transmitted to the Cashier of the Company as collected together with a list showing the accounts to which such premiums are to be credited. The commission on such payments will be credited to your account immediately.

6. In consideration of the commission provided herein, it is understood and agreed that you are to pay all postage, mailing costs, printed matter and supplies in connection with the promotion and installation of the policy and that you will pay all expense involved in the billing and collection of all premiums, either first year or renewals.

7. The commissions provided herein shall be payable to you as long as the Company retains the business (such retention being optional with the Company) but such payment shall be subject to and contingent upon your continued recognition by the American College of Surgeons as agent or broker of record for said risk and your continued servicing of the risk.

8. If this risk proves unprofitable to the Company, it is agreed that the policy may be terminated or if it appears practicable to attempt to save the risk, you are to cooperate fully with the Company to that end by such adjustments of rates, commissions or procedures as shall be deemed necessary by the Company.

Prior to November 1951 and the signing of the above contract, Continental had never entered into any written agreement to pay Charles O. Finley and Company or the individual partners any amounts either for services rendered or as loans and no such amounts were paid.

Also, in 1952, Charles O. Finley and Company negotiated group insurance and accident health insurance policies on a nationwide basis with the Urological Association and American Proctological Association similar to the American College of Surgeons' policy. Likewise, in 1952, Charles O. Finley and Company sold group insurance with lifetime accident benefits and 5-year sickness benefits to the Hennepin County Medical Society. The Hennepin County Medical Society was the first county medical society in the country to adopt such a group plan. These various programs similar in

nature to that set up for the American College of Surgeons were underwritten by North American and dated in December 1952.

In 1953 Charles O. Finley and Company worked on similar group accident and health policies and attempted to sell such long-term policies to high-grade professional associations. During 1953, Lumbermen's Mutual Casualty Company underwrote four group plans for Charles O. Finley and Company as follows: American Academy of Pediatrics; California Medical Association; Pacific States Medical Association; and Chicago Medical Association. Charles O. Finley and Company still receives commissions on these group policies from Lumbermen's.

After Charles O. Finley and Company signed the Continental contract, the partnership had brochures ranging from one to four pages, as well as application forms, printed, and it mailed these by letter to the individual fellows of the American College of Surgeons soliciting them to participate in the above group sickness and accident insurance program. At the end of 90 days, 52 per cent of the fellows had enrolled. This enrollment enabled the program to become effective April 1, 1952, and under these circumstances Continental did not have the right to screen applicants and issue policies only to those who they considered were good risks.

In 1952 Charles O. Finley and Company needed operating funds, and Finley went to the Gary National Bank and borrowed $5,000. Also, not long after entering into the American College of Surgeons contract, Continental loaned Finley $10,000 on an interest-bearing note to pay promotional expenses related to that contract, and Finley opened an office in downtown Chicago with three employees. Prior to that time, the partnership had operated out of a small, one-room office in Gary, with no paid secretarial help. Finley went to a printer and gave him an order for the brochures to be printed. The printer at first refused to do the work unless the order was accompanied by a $5,000 deposit. Finley then threatened to take his business elsewhere, and the printer agreed to do the work without the deposit.

Continental during the years 1952 to 1956 paid to Charles O. Finley and Company and to Charles O. Finley Company, Inc., with respect to the American College of Surgeons policy the following commissions:

| | |
|---|---|
| 1952 | $441,563.22 |
| 1953 | 247,937.74 |
| 1954 | 222,890.07 |
| 1955 | 228,365.34 |
| 1956 | 4,596.12 |

During the first 3 months of 1953 and 1954, Charles O. Finley and Company received on the above policy $13,936.88 and $6,533.45, re-

spectively, which amounts were included in the above yearly totals.

The total commissions paid in 1952, the first year of the Continental policy, were all based on 27½ per cent of the net premiums received on all new additions to the American College of Surgeons group. The breakdown between commissions received on the basis of 27½ per cent on all new additions to the group after April 1, 1952, and commissions of 10 per cent (15 per cent less 5 per cent held in reserve by Continental) on all renewal premiums was as follows during the years 1953–1956, inclusive:

| Year | 27½ per cent rate | 10 per cent rate |
|------|-------------------|------------------|
| 1953 | $89,540.65 | $158,397.09 |
| 1954 | 31,568.43 | 191,321.64 |
| 1955 | 32,215.60 | 196,149.74 |
| 1956 | 6,402.12 | [1] (1,806.00) |

[1] Charged back to Charles O. Finley and Company because of refunds due on policy.

Of the $13,936.88 in commissions paid Charles O. Finley and Company during the first 3 months of 1953, $13,540.08 represented new business commissions and $396.80 represented renewal commissions. No similar breakdown was made with respect to the $6,533.45 in commissions paid during the first 3 months of 1954.

On January 5, 1956, Louis C. Morrell, second vice president of Continental, mailed a registered letter to the American College of Surgeons which provided in part as follows:

Under the terms of our policy 1–A–0217, which was issued to the American College of Surgeons, effective April 1, 1952, either the Holder or the Company may terminate the policy as of the first day of April any year after 1952 by giving written notice to the other 60 days prior to said termination date.

This is to notify you that Continental Casualty Company elects to terminate, and does hereby terminate, policy 1–A–0217, as of April 1, 1956.

The policy was terminated April 1, 1956.

After 1956 the American College of Surgeons policy was reinstated and underwritten by Lumbermen's Mutual Casualty Company with Charles O. Finley and Company, Inc.

The partnership of Finley and Smith was terminated on April 1, 1954, and the business was incorporated on that date. Since that date, Charles O. Finley and Company, Inc., has done business as a corporation with Finley and Smith as employees of the corporation. All commissions paid by Continental after April 1, 1954, with respect to the American College of Surgeons policy and set out above were paid to Charles O. Finley and Company, Inc.

Prior to 1952, the partnership Charles O. Finley and Company did not file partnership returns but, instead, Finley and Smith on their individual returns each reported 50 per cent of the net profits of the partnership.

The partnership Charles O. Finley and Company was on the cash receipts and disbursements method of accounting in 1952 and 1953. Two partnership returns of Charles O. Finley and Company for the calendar year 1952 were signed by Finley and Smith and filed on March 16, 1953. On the smaller partnership return, the principal business activity was reported to be insurance broker and total income, total deductions, ordinary net income, and net long-term capital gain in the respective amounts of $31,367.83, $26,623.86, $4,743.97, and $6,750 were reported.

On the larger partnership return for 1952, total income, total deductions, and ordinary net income in the respective amounts of $500,959.15, $143,978.95, and $356,980.20 were reported with the following statement breaking down the amount of $356,980.20:

During 1952, the taxpayer, as the result of acting as exclusive broker and agent for various Medical Associations and each of their members in the procuring and placing of group insurance with Insurance Companies, earned the following commissions: April 1, 1952, $324,138.02, American College of Surgeons; December 1, 1952, $3,212.82, Vanderburgh County, Evansville, Indiana; December 31, 1952, $29,629.36, American Urological Association, American Proctologic Society, and Hennepin County Medical Society.

The claim was made on Schedule 1 of the second partnership return for 1952 referred to above that the amount of $356,980.20 regarded as ordinary net income should be allocated as follows:

Schedule 1

ALLOCATION OF COMPENSATION TO EACH CALENDAR YEAR IN WHICH SERVICE WAS PERFORMED—SECTION 107

Date of Contract
April 1, 1952—Premiums paid one year in advance Income allocated over period of months commencing with 1-1-46 and ending with 4-1-53. $3,725.72 per month

| Total compensation | 1946 | 1947 | 1948 | 1949 | 1950 | 1951 | 1952 | 1953 |
|---|---|---|---|---|---|---|---|---|
| $324,138.02 | $44,708.64 | $44,708.64 | $44,708.64 | $44,708.64 | $44,708.64 | $44,708.64 | $44,708.64 | $11,177.54 |

December 1, 1952—Premiums paid one year in advance—Income allocated over period of months commencing with 1-1-46 and ending with 12-1-53. $538.20 per month

| 3,212.82 | 405.84 | 405.84 | 405.84 | 405.84 | 405.84 | 405.84 | 405.84 | 371.94 |

December 31, 1952—Premiums paid one year in advance—Income allocated over period of months commencing with 1-1-46 and ending 12-31-53. $308.64 per month

| 29,629.36 | 3,703.68 | 3,703.68 | 3,703.68 | 3,703.68 | 3,703.68 | 3,703.68 | 3,703.68 | 3,703.60 |

| $356,980.20 | $48,818.16 | $48,818.16 | $48,818.61 | $48,818.16 | $48,818.16 | $48,818.16 | $48,818.16 | $15,253.08 |

Charles O. and Shirley Finley—Split Income in all years.

| $178,490.10 | $24,409.08 | $24,409.08 | $24,409.08 | $24,409.08 | $24,409.08 | $24,409.08 | $24,409.08 | $7,626.54 |

Calvin and Thelma Smith—Split Income in all years.

| $178,490.10 | $24,409.08 | $24,409.08 | $24,409.08 | $24,409.08 | $24,409.08 | $24,409.08 | $24,409.08 | $7,626.54 |

Attached as part of Schedule 1 of the partnership return for 1952 was a statement in part as follows:

Under an exclusive contract dated April 1, 1952, with the Continental Casualty Company of Chicago and contracts with the North American Accident Insurance Company dated December, 1952, all premiums on above contracts are collected by taxpayer and remitted weekly to the Insurance Company, at which time commissions on such payments are credited to taxpayer's account. Consequently, the amount earned depends upon the personal efforts of taxpayer as broker and agent for the various associations in placing the business and then collecting and handling the premiums.

The commissions are also contingent upon the taxpayer's continued recognition by the above medical associations as exclusive agent or broker of record for procuring and servicing this type of insurance coverage. In other words, the taxpayer went to considerable expense and personal time to secure and place this business without any guarantee at all that he would continue to retain the contract. The contract may be canceled by the Medical Association or the Insurance Company at the end of any policy year, thereby eliminating the taxpayer from receiving any further compensation. It is entirely possible for the taxpayer to install a program of this type at a loss during the first year hoping to make up for the loss in future years and find at the end of the first year either the Company canceling the contract or the Association canceling the contract and placing the business with another insurance company and broker.

It is the taxpayer's contention that because of extensive research, ground work and planning prior to 1952, necessary to promote each contract separately, that the commissions under each brokerage contract is subject to relief under Section 107.

Likewise, experience to date indicates that the Commission collected on the original contracts can and possibly might be reduced, thus increasing the difference between acquisition and renewal cost of the contract for insurance. In other words, if the losses are too great for the Insurance Company, then it is compulsory for the taxpayer to take a reduction in his commission in order to conserve the business. Since this is the first time in the history of the insurance industry to write this type of insurance contract, it is entirely a gamble on the insurance company's part as to whether or not the premium is adequate for this type of comprehensive coverage. Insurance companies being very conservative will not underwrite a type of contract such as this without first having experience and statistics to go by. It was because of the taxpayer's personal effort, persuasion and experience that the company agreed to write this contract.

Petitioners Finley and Smith in their respective returns for the calendar year 1952 as equal partners reported the above amounts as allocated on the above schedule of the partnership return and made a tax computation purportedly under section 107 spreading this partnership income over the years 1946 to 1953, inclusive.

Petitioners Calvin L. Smith and Thelma F. Smith failed to make or file a declaration of estimated tax for the taxable year 1952.

Charles O. Finley and Company did not employ a double entry bookkeeping system. Its only record of expenses was canceled checks and the latter were the basis of the expenses reported on the 1952

return. The partnership claimed on its 1952 return printing expenses in the amount of $12,201.87. The partnership did not pay printing expenses in excess of that amount in 1952.

OPINION.

The respondent having determined that petitioners are not entitled to allocate their income pursuant to section 107(a) of the 1939 Code, the burden is upon them to establish otherwise.

Section 107(a) provides:

SEC. 107. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF THIRTY-SIX MONTHS OR MORE AND BACK PAY.

(a) PERSONAL SERVICES.—If at least 80 per centum of the total compensation for personal services covering a period of thirty-six calendar months or more (from the beginning to the completion of such services) is received or accrued in one taxable year by an individual or a partnership, the tax attributable to any part thereof which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual.

The respondent maintains that petitioners failed to establish the following two requisites to qualification under the section, namely:

(1) That the compensation in question was for personal services covering a period of 36 calendar months or more from the beginning to the completion of the services; and

(2) That the compensation received in 1 taxable year (1952 in the instant case) was not less than 80 per cent of the total compensation for such personal services.

The petitioners claim that the personal services here involved commenced in 1946, the year Finley entered the hospital and began to consider his plan. However, the evidence does not support such a claim. That Finley began to think about such a plan, we do not doubt. Likewise, the evidence establishes that he studied insurance textbooks rather extensively, and that he discussed the plan with his brother-in-law, Smith. However, so far as we can determine, the plan, if it could be so dignified at that time, was not reduced to writing. No rate schedules have been submitted which were prepared at that time. We have no worksheets or similar papers of Finley from that period. Finley testified that he wrote a number of insurance companies about the plan while in the hospital but no such letters, or copies of them, are in evidence.

Subsequent to his release from the hospital, Finley, at first alone and then together with Smith, discussed the plan on numerous occasions with the representatives of a number of insurance companies, although there is no evidence that a detailed written plan was ever prepared or submitted until at least 1951.

The compensation here in question is the commissions paid the partnership in 1952 by Continental with respect to the group policy of the American College of Surgeons. The petitioners' first contact with either of those parties was in the spring of 1951. At that time, Finley met General Hawley, the director of the College of Surgeons, and it was at that meeting that Finley, after an initial and unsuccessful effort to interest Hawley in a standard group accident and sickness policy, broached the subject of a policy with broader benefits. He gave few, if any, details and Hawley did no more than declare that he would be interested in discussing the matter further if a broader policy became available.

It was at about the same time that Finley contacted Continental and endeavored to interest the company in underwriting the broader plan. He did not succeed, and it was then not until November of the same year, after the withdrawal of North American, that Continental reentered the picture and any type of service relationship could be said to have arisen between that company and Finley.

In support of their contention that the services commenced in 1946, petitioners cite *James D. Gordon*, 10 T.C. 772 (1948), affd. 172 F. 2d 864 (C.A. 2, 1949), as standing for the proposition that "making unsuccessful efforts" must be included in determining what services have been rendered within the meaning of section 107(a). The decision in question indicates that the unsuccessful selling efforts of a broker would not be excluded in making that determination if a brokerage agreement had been entered into with a party to the sale or, at least, an understanding reached. There is no suggestion whatsoever in that opinion that services performed prior to the existence of such an agreement or understanding could be considered for purposes of section 107(a).

Similarly, petitioners are not aided by *Frank Stephen Ranz*, 31 T.C. 91 (1958), which they cite in support of their contention that time spent in unsuccessful efforts as well as in preliminary exploratory work must be considered. We do not doubt the correctness of this contention, and the proposition can be considered well established. *Guy C. Myers*, 11 T.C. 447 (1948). So stated, however, the proposition simply begs the question insofar as these petitioners are concerned. Each of the cases cited by petitioners involves unsuccessful or preliminary efforts made *after* an arrangement for the performance of services had been entered into. There is no suggestion whatsoever in any of the cases cited that such efforts prior to such a time should be counted.

In *Guy C. Myers, supra*, we declared, "[U]nder even the most liberal rule of construction we are persuaded that services cannot be rendered to a nonexistent person and we cannot consider 'work' and

'services' as synonymous terms." In the same case we stated (at p. 457) as follows:

Artists, writers, composers and inventors frequently work for long periods on the development of artistic productions or useful ideas without being able to say they are "rendering services" because there is no particular person for whom they are working. The mere fact that Congress, in enacting the 1942 amendment to section 107, felt called upon to add a special paragraph to said section in order to include the work which had been done under specified conditions to be considered as services rendered, would clearly indicate that those groups not covered by the amendment could not get the benefit of the act. * * * If Congress had intended to permit promoters to include the work which they performed in acquiring customers in their period of service after the customers are acquired, it would have been very easy to include promoters with artists, writers, composers, and patentees.

While there is no suggestion that Continental and the College of Surgeons were not in existence in 1946, it is perfectly plain from the record that there was no arrangement of any sort whatsoever between either of them on the one hand and Finley and Smith on the other prior to 1951, or, for that matter, that either Continental or the college even knew of the latters' existence. Insofar as the record discloses, neither Finley nor Smith had even an informal or casual contact with either the college or Continental prior to 1951. We believe it perfectly clear from the plain words of section 107(a), as well as on the authority of *Guy C. Myers, supra,* that, in order to perform personal services within the meaning of section 107(a), such services must be performed for and rendered to someone. In the instant case, such a requirement was not met prior to 1951. The earliest possible point at which the services could be counted for purposes of the section was the spring of 1951 when Finley first contacted Hawley. However, even at that date, there is no evidence of any arrangement or understanding, tacit or otherwise, between Hawley and Finley. Hawley expressed interest, nothing more, in hearing further about a policy providing broader benefits. He certainly did not engage the petitioners' services at that time. It was not until November of 1951 that the relationship between Finley on the one hand and the College of Surgeons on the other became sufficiently definite so that a personal service arrangement could be said to have arisen. On November 20, 1951, Continental authorized Finley to present on its behalf the broader benefit plan to the American College of Surgeons and committed itself to underwrite the plan if he were successful. We conclude that for purposes of section 107(a) the personal services here involved began on November 20, 1951.

The question of when the personal services were completed is closely interwoven with the determination of whether the compensation received in 1952 was 80 per cent or more of the total compen-

sation received for those services. The commissions received in 1952 by petitioners from Continental with respect to the College of Surgeons policy amounted to $441,563.22. The total commissions paid by Continental with respect to the policy to the partnership (and later to the corporation) amounted to $1,145,352.49. The commissions received in 1952 were less than 80 per cent of the latter total so that petitioners would not qualify under section 107(a) if the $1,145,352.49 represents the total received for the services involved.

However, the petitioners point to the fact that the contract between Continental and the College of Surgeons was terminable at the end of 1 year upon the giving of a 60-day notice. From this fact, petitioners argue that the partnership's fixed rights to commissions extended only from April 1, 1952, to March 31, 1953, and, therefore, contend that their services were completed on March 31, 1953. This contention is without basis. The mere existence of a right of termination can hardly be considered to fix the duration for which services under the contract were performed unless that right was in fact exercised. Here, that right was not exercised and the contract was not terminated until 1956. However, even if petitioners were correct in this contention, namely that their services must be considered to have terminated March 31, 1953, then they automatically are disqualified from the benefits of section 107(a) because they fail to meet the 36-month test inasmuch as we have held that the services did not begin until November 20, 1951.

The petitioners argue alternatively that the commissions received subsequent to the partnership's incorporation must be severed from those received prior thereto and, therefore, that only the commissions received prior to April 1, 1954, the date of incorporation, can be considered for the purpose of the 80 per cent test.

The petitioners cite *Ralph B. Wattley*, 31 T.C. 510 (1958), in support of their alternative position. In that case, the petitioner conducted a real estate business in the name of a corporation, all of the stock of which he owned. He claimed that the corporation was merely a "dummy" or front used by him in carrying on his business as a real estate broker so that a commission paid to it was in fact received by him for services which he rendered as an individual. Under the facts of that case, we refused to disregard the corporate entity, citing *Commissioner* v. *Moline Properties, Inc.*, 131 F. 2d 388, 389 (C.A. 5, 1942), affd. 319 U.S. 436 (1943). However, the *Wattley* case is clearly distinguished from that before us here. In *Wattley*, we refused to disregard the corporate entity in determining whether the amount which the taxpayer sought to allocate had been received "by an individual or a partnership" as required by section 107(a). There is no such issue before us here. Charles O. Finley and Company was a partnership in the taxable

year. The question before us is the determination of the total compensation paid for the particular personal services, not to whom paid. There is no showing that the personal services involved here underwent any change in character on April 1, 1954; or that the College of Surgeons entered into a new brokerage agreement as of that date; or that Continental entered into a new commission agreement on that date. On the contrary, the evidence shows that there was but one employment from which inseparable compensation was received from one source. Thus, despite petitioners' argument, we are not confronted with an issue whose resolution requires either recognizing or disregarding a corporate entity. The question before us is *how much* did Continental pay for the services and not *to whom* did it make such payment. To hold otherwise would make a mockery of section 107(a) by permitting a taxpayer to qualify for its benefits by the simple expedient of converting his business into a corporation just prior to violating the 80 per cent test.

We hold, therefore, that the commissions paid to Charles O. Finley and Company, Inc., cannot be severed from those paid Charles O. Finley and Company for the purpose of applying the 80 per cent test.

Consistent with the argument which we have just rejected, the petitioners maintain that the termination of the partnership and the creation of the corporation on April 1, 1954, also ended the period for which services were rendered. Hence, if we were to accept this severability argument (which we do not), the petitioners would again be disqualified under the 36-month test because March 31, 1954, is less than 36 months from November 20, 1951.

However, the petitioners advance yet another theory which is that new policy commissions payable at the $27\frac{1}{2}$ per cent rate are severable from the renewal commissions payable at the 10 per cent rate. The respondent maintains that renewal commissions are not severable from new business commissions, citing, *inter alia, Harry Boverman*, 10 T.C. 476 (1948). Petitioners point out correctly that the latter case involved commissions on life insurance policies and argue that it is, therefore, distinguishable on the ground that accident and health insurance policies require continual servicing, unlike life insurance policies. However, we need not decide that question. The total of all new policy commissions through 1956 when the contract was terminated was $601,290.02. $441,563.22 is less than 80 per cent of that amount so that, even if the new business commissions are severable from renewal commissions, as petitioners contend, they cannot meet the statutory requirement. Of course, the petitioners argue that only new policy commissions up to April 1, 1954, the date of incorporation, should be counted, but we have already rejected their contention in this regard.

The respondent's determination that the petitioners failed to meet the statutory requirements of section 107(a) is sustained.

With respect to the printing expense issue, the issue is disposed of by our finding of fact, in the light of the entire record, that the partnership did not pay printing expenses in excess of $12,201.87 in 1952. No canceled checks and no invoices were put in evidence. There was no testimony by the printer. The only evidence was the testimony of the petitioners, and, while we are satisfied from the evidence that the partnership had substantial printing expenses in 1952, there is no evidence whatsoever to support a deduction in excess of the amount originally claimed.

With respect to the sole remaining issue, we have found as a fact that petitioners Calvin L. Smith and Thelma F. Smith failed to make or file a declaration of estimated tax for 1952. The only explanation offered for such failure was Smith's testimony that he had no technical knowledge of the tax laws with respect to the requirements for filing a declaration of estimated tax. The failure to make or file a declaration was without reasonable cause and the respondent's imposition of the addition to tax under section 294(d) (1)(A) of the 1939 Code is sustained. However, in view of the recent decision in *Commissioner* v. *Acker*, 361 U.S. 87 (1959), the respondent's determination that petitioners Smith are also liable to an addition to tax under section 294(d)(2) for substantial underestimation of tax is not sustained.

*Decisions will be entered under Rule 50.*